James Neil GERMAN, Appellant,

v.

UNITED STATES, Appellee.

No. 85–1621.

District of Columbia Court of Appeals.

Argued Nov. 13, 1986.
Decided May 7, 1987.

Allan P. Feigelson, for appellant.

Larry R. Parkinson, Asst. U.S. Atty., with whom Joseph E. diGenova, U.S. Atty., and Michael W. Farrell, Thomas E. Zeno, and Blanche L. Bruce, Asst. U.S. Attys., were on the brief, for appellee.

Before PRYOR, Chief Judge, FERREN, and ROGERS, Associate Judges.

ROGERS, Associate Judge:

Appellant James Neil German was convicted by a jury, upon retrial after the first jury was unable to return a verdict, of one count of trafficking in stolen property, D.C. Code § 22–3831 (1986 Supp.), and sentenced to 40 months to ten years and fined $10,000. On appeal he contends that the trial judge improperly participated in the plea negotiations, and that he was later penalized with a heavier sentence for exercising his right to a jury trial. He also challenges the validity of the trafficking statute on the grounds that it was improperly enacted, is unconstitutionally overbroad and void for vagueness, and unconstitutionally deprives him of the defense of impossibility. Further, he argues that the trial court committed reversible error by admitting into evidence (1) the testimony of George Melson, which constituted evidence of other crimes, and (2) a tape, a copy of the tape, and a derivative transcript of an undercover conversation between German and a police officer, which allegedly were not supported by a sufficient chain of custody, and by excluding the testimony of German's accountant, who sought to introduce German's income tax returns. Finally, German challenges the refusal of the trial judge to give requested jury instructions that an adverse inference could be drawn from the government's failure to call as a witness one of the officers engaged in the undercover operation, and that the government must have had reasonable suspicion to commence an investigation in order to avoid an entrapment defense.

We agree the trial court's pretrial remarks violated Super. Ct.Crim.R. 11(e)(1); however, German has failed to meet his burden to show prejudice in that he was penalized for exercising his sixth amendment right to a jury trial. We find no merit to his statutory challenges and no evidentiary or instructional error. Accordingly, we affirm.

1. German was tried jointly with Henson (Cr. No. F–2192–83), who was convicted of three

I.

The investigation of James German began when George Melson complained to a criminal investigator at the United States Department of Agriculture that his friend, Jessie Weems, was illegally exchanging food stamps at German's grocery store for cash, liquor, and other non-food items. The Agriculture Department investigator, Mel Bowling, contacted the Metropolitan Police and, after substantial planning, Officer Rufus Archer, who had worked in an undercover capacity several thousand times, was supplied with bait property and $250 worth of food stamps. On January 4, 1983, he and Russell Anderson, a special Department of Agriculture employee, entered German's store, the G & G Grocery Store, while Bowling provided surveillance from a parking lot. After a short conversation inside, a store employee, Kenneth Henson,[1] told Archer that he could handle the stamps, but that Archer would have to see German about the goods. German entered the room shortly thereafter, instructed Henson to pay Archer $125 for the stamps, and went outside to inspect the property, which he later purchased. Archer testified he told German that the goods, a stereo receiver and a cordless telephone, had been stolen by a buddy who worked at the Hecht Company, and were worth $550. German purchased the goods for $150, and inquired into the possibility of obtaining more food stamps and property.

Archer made a similar sale of food stamps to German eight days later. This time, Archer stated that the food stamps had been stolen by a friend who worked at 300 Indiana Avenue, where the stamps were produced. German asked about the method used to steal the stamps and instructed Archer on how the stamps should be stolen in order to prevent the tracing of the serial numbers.

On February 10, 1983, Archer was fitted with a body recorder and returned to the G & G Grocery Store with another cordless telephone and a digital clock. German purchased the goods for either $50 or $55, and

counts of attempting to receive stolen property. Henson's conviction is not part of this appeal.

later asked, "What else can you get me." A conversation ensued in which German expressed his interest in purchasing more goods, especially televisions with remote control, to be stolen from the Hecht's warehouse by a "friend," whose identity he did not want to know; he also stated that he had "been in this business 15 years." [2] German was arrested on a warrant five days later.

German did not testify at the trial. In his defense he called three witnesses who testified that on January 4, 1983, they had seen a man fitting Archer's description offer to sell some Christmas gifts in order to avoid an eviction, that German had left the store with Archer, and that they had returned with boxes resembling Christmas gifts. Michael Dearring, a sales manager at Circuit City, testified that on January 4, 1983, German purchased two color television sets. Susy Miles testified as a character witness that German's reputation for truth and honesty "as far as I can explain, [is] excellent."

German's initial trial before Judge Salzman resulted in a mistrial when the jury failed to return a verdict. At the second trial, also before Judge Salzman, a jury convicted German of trafficking in stolen property, and he was sentenced to 40 months to ten years and fined $10,000. This appeal followed.

## II. *Judicial Participation.*

German first contends that the trial judge improperly participated in the plea bargaining process by suggesting a plea bargain, by expressing his view that the case was not very serious and the evidence not very strong, and by commenting on the likely sentence. The statements occurred as follows:

THE COURT: Well, I will put it this way. How about an attempted trafficking in stolen property? That would be an offense, and it would be a misdemeanor. I would suggest—Does that seem reasonable to your client? That would

carry no more than a year. I would put it to you this way. This is not the most overwhelming criminal conspiracy I have seen in my lifetime, to put it politely; and the government's case may be strong enough to get a conviction, but I am not sure it's overwhelming. It did not get a conviction last time. I am not sure, you know, this does not seem to be odd, if something involves conspiracy, that the Agriculture Department is dying to stamp out or the world will come to an end unless a finding of trafficking is returned in this matter. It's not the oldest or the newest case on the calendar, *nor is it one* that appears to be life-threatening, *that would require the incarceration of any of these individuals if convicted, and surely they would be released pending appeal in any event.* And it's a question of commitment of resources to a matter like that. And if you would, we will continue this until eleven.

MS. BRUCE [the prosecutor]: Yes, sir.

THE COURT: And if you would be kind enough to simply convey my thoughts? I have no opinion as to whether the defendant is or is not guilty; whether it's worth a five day trial on the part of the Government, whatever the outcome, and if that would seem a reasonable disposition of the whole thing to you? ...

But I will proceed to trial at eleven o'clock, this morning; and if you wish to go to trial, so be it. I will simply try something else. This is far more interesting than the usual drug dealing.

(Emphasis supplied.) German argues that these statements constituted impermissible judicial participation in the plea bargaining process in violation of Super. Ct.Crim.R. 11(e)(1), and that he relied on the trial judge's projections in choosing to go to trial rather than to accept a plea bargain. [3] He further contends that, after his conviction, the judge imposed the maximum sentence as a penalty for German's exercise of

---

2. These statements were contained in the transcript that was made from a tape of the conversation.

3. The government offered to dispose of all the charges if German pleaded guilty to three misdemeanors.

his sixth amendment right to a trial by jury.

## A.

Rule 11(e)(1) provides that a trial judge "shall not participate in any ... discussions" leading to a plea agreement between a defendant and the government.[4] As interpreted by the federal courts,[5] the rule prohibits a trial judge "from assuming the role of an active negotiator in the plea bargaining process." *Frank v. Blackburn*, 646 F.2d 873, 880 (5th Cir.1980) (en banc) (applying identical federal provision), *modified*, 646 F.2d 902 (deleting statement that lack of remorse demonstrated by failure to plead guilty is itself a justification of a more severe sentence), *cert. denied*, 454 U.S. 840, 102 S.Ct. 148, 70 L.Ed.2d 123 (1981). The rule, according to *United*

States v. Werker, 535 F.2d 198, 201 (2d Cir.), *cert. denied*, 429 U.S. 926, 97 S.Ct. 330, 50 L.Ed.2d 296 (1976),

> leaves no room for doubt that its purpose and meaning are that the sentencing judge should take no part whatever in any discussion or communication regarding the sentence to be imposed prior to the entry of a plea of guilty or conviction, or submission to him of a plea agreement.

The *Werker* court issued a writ of mandamus prohibiting the trial judge from disclosing, prior to the pleadings, the sentence to be imposed if a guilty plea was entered. *Id.* at 201–04. This prohibition is absolute because of the "role required of the judge once an agreement is reached: the court must decide for itself whether to accept or reject the plea bargain." *United States v.*

---

4. The rule is identical to the federal rule, FED.R. CRIM.P. 11(e)(1). We look to federal decisions in interpreting our rule. *See McClurkin v. United States*, 472 A.2d 1348, 1359 n. 14 (D.C.1984); *Williams v. United States*, 408 A.2d 996, 998–99 (D.C.1979).

5. In adopting the amendment to Rule 11 in 1974, that "the trial judge shall not participate ...," the Advisory Committee commented that the amendment was adopted notwithstanding recognition of the fact that judicial comment is a common practice. The amendment follows the American Bar Association STANDARDS RELATING TO PLEAS OF GUILTY § 3.3(a) (1968) in recognizing that

> There are valid reasons for a judge to avoid involvement in plea discussions. It might lead the defendant to believe that he would not receive a fair trial, were there a trial before the same judge. The risk of not going along with the disposition apparently desired by the judge might induce the defendant to plead guilty, even if innocent. Such involvement makes it difficult for a judge to objectively assess the voluntariness of the plea. See ABA Standards Relating to Pleas of Guilty § 3.3(a), Commentary at 72–74 (Approved Draft, 1968); Note, Guilty Plea Bargaining: Compromises By Prosecutors To Secure Guilty Pleas, 112 U.Pa.L.Rev. 865, 891–892 (1964); Comment, Official Inducements to Plead Guilty: Suggested Morals for a Marketplace, 32 U.Chi.L.Rev. 167, 180–183 (1964); Informal Opinion No. 779 ABA Professional Ethics Committee ("A judge should not be a party to advance arrangements for the determination of sentence, whether as a result of a guilty plea or a finding of guilt based on proof."), 51 A.B.A.J. 444 (1965). As has been recently pointed out:

> The unequal positions of the judge and the accused, one with the power to commit to prison and the other deeply concerned to avoid prison, at once raise a question of fundamental fairness. When a judge becomes a participant in plea bargaining he brings to bear the full force and majesty of his office. His awesome power to impose a substantially longer or even maximum sentence in excess of that proposed is present whether referred to or not. A defendant needs no reminder that if he rejects the proposal, stands upon his right to trial and is convicted, he faces a significantly longer sentence. *United States ex rel. Elkins [Elksnis] v. Gilligan*, 256 F.Supp. 244, 254 (S.D.N.Y.1966).

On the other hand, one commentator has taken the position that the judge may be involved in discussions either after the agreement is reached or to help elicit facts and an agreement. Enker, Perspectives on Plea Bargaining, in President's Commission on Law Enforcement and Administration of Justice, Task Force Report: The Courts 108, 117–118 (1967).

The amendment makes clear that the judge should not participate in plea discussions leading to a plea agreement. It is contemplated that the judge may participate in such discussions as may occur when the plea agreement is disclosed in open court. This is the position of the recently adopted Illinois Supreme Court Rule 402(d)(1) (1970), Ill.Rev. Stat. 1973, ch. 110A, § 402(d)(1). As to what may constitute "participation," contrast *People v. Earegood*, 12 Mich.App. 256, 268–269, 162 N.W.2d 802, 809–810 (1968), with *Kruse v. State*, 47 Wis.2d 460, 177 N.W.2d 322 (1970).

*Adams,* 634 F.2d 830, 835 (5th Cir.1981). Appellate courts have, however, shown more tolerance [6] to judicial commentary on likely sentences when the judge's statement is made at the specific request of the defendant. *See Frank v. Blackburn, supra,* 646 F.2d at 880, 883; *Blackmon v. Wainwright,* 608 F.2d 183, 184 (5th Cir. 1979) (per curiam), *cert. denied,* 449 U.S. 852, 101 S.Ct. 143, 66 L.Ed.2d 64 (1980).

■ In the instant case, the trial judge *sua sponte* commented negatively on the strength of the government's case, suggested a misdemeanor plea would be an appropriate disposition and predicted that only a very light sentence, without incarceration, would result from a conviction. This general type of commentary constitutes participation in the plea negotiation process as proscribed by Rule 11(e). Somewhat strangely, these comments, would seem [7] to have the effect of reducing the defendant's desire to enter a guilty plea, especially where the first jury had been unable to reach a verdict, because the judge has lent his apparent authority and knowledge to the view that the trial prospects for acquittal were good. By contrast, most Rule 11 participation cases are concerned with protecting the defendant from being coerced into entering a guilty plea. *See, e.g., Byrd v. United States,* 377 A.2d 400 (D.C.1977). Nonetheless, these comments are still participation within the letter of Rule 11 because they intrude upon the judicial neutrality that is so central to both the plea bargaining and the sentencing process, *see supra* note 5; *cf. id.* at 404, and they still may improperly influence the defendant's decision. *Cf. Blackman v. Wainwright, supra,* 608 F.2d at 184 ("chilling effect"); *see also Blackledge v. Perry,* 417 U.S. 21, 28, 94 S.Ct. 2098, 2102, 40 L.Ed.2d 628 (1974).

### B.

The question remains, however, of the appropriate remedy for improper judicial participation in plea negotiations. Rule 11 prescribes a rule of practice for trial courts; it does not embody a constitutional limitation. On this record we are satisfied that German has failed to show that his ability to reach a voluntary and informed decision has been objectively prejudiced.[8] In *Adams, supra,* 634 F.2d at 838, the court stressed the prophylactic nature of Rule 11, and held that defendants whose guilty pleas are taken in violation of this rule should be allowed to replead without

**6.** The government correctly notes that the Constitution does not forbid a "moderate type of participation" in plea negotiations. *Damiano v. Gaughan,* 770 F.2d 1, 2 (1st Cir.1985) (judge told defendant he had 18–20 year sentence in mind). While this proviso can protect judicial inquiries into the progress of plea negotiations, it cannot excuse judicial comments on the strength of the case and on the likely sentence to follow conviction. Moreover, because Rule 11 provides broader protections than the Constitution, it will be important to determine constitutionality only if the proposed remedy implicates these concerns.

**7.** This court's analysis must be based upon "objective record facts rather than upon the defendant's recital of what he now claims were his subjective mental impressions." *United States ex rel. Robinson v. Housewright,* 525 F.2d 988, 991–92 (7th Cir.1975).

**8.** In view of this determination, we need not decide whether the trial judge actually influenced German's decision to stand trial. Super. Ct.Crim.R. 11(h), which became effective on September 1, 1985, states that a deviation from Rule 11 "which does not affect substantial rights shall be disregarded." The harmless error standard was also tacitly recognized in prior case law. The view was that Rule 11 "states a standard for federal courts, not necessarily a constitutional inhibition." *Blackmon v. Wainwright, supra,* 608 F.2d at 184. Thus, "Rule 11's unqualified prohibition of judicial involvement in plea bargaining will not necessarily invalidate every instance of judicial participation in the negotiation of a guilty plea *in state court.*" *Frank v. Blackburn, supra,* 646 F.2d at 880. Generally, judicial participation in plea negotiations is prohibited as a constitutional matter when it is so great as to render a guilty plea involuntary. *Toler v. Wyrick,* 563 F.2d 372, 373 (8th Cir.1977), *cert. denied,* 435 U.S. 907, 98 S.Ct. 1455, 55 L.Ed.2d 498 (1978); *Brown v. Peyton,* 435 F.2d 1352 (4th Cir.1970), *cert. denied,* 406 U.S. 931, 92 S.Ct. 1785, 32 L.Ed.2d 133 (1972). Other courts typically acknowledge that Rule 11 requires a greater willingness to set aside guilty pleas or to order resentencing. *Compare Adams, supra,* 634 F.2d at 830 (applying prophylactic rule when purposes of rule would be furthered) *with Frank v. Blackburn, supra,* 646 F.2d at 880 (Rule 11 is a court procedure that does not require automatic reversal).

having to demonstrate actual prejudice. The court qualified this stringent approach, however, by not requiring strict enforcement whenever the Rule's "core concerns" are adequately addressed. *Id.; see also McCarthy v. United States*, 394 U.S. 459, 89 S.Ct. 1166, 22 L.Ed.2d 418 (1969) (actual prejudice not required in earlier, narrower form of Rule 11); *United States v. Dayton*, 604 F.2d 931 (5th Cir.1979) (en banc) (core concerns include lack of coercion, comprehension of charge, and knowledge of direct consequences), *cert. denied*, 445 U.S. 904, 100 S.Ct. 1080, 63 L.Ed.2d 320 (1980).

"[I]mplicit in Super.Ct.Crim.R. 11 is the requirement that any guilty plea represent a voluntary choice among the alternative courses of action open to the defendant." *Byrd, supra*, 377 A.2d at 404. While the main purpose underlying Rule 11 is to prevent coerced guilty pleas, similar concerns would apply to the possibility of a deceptively induced decision to reject a plea offer and proceed to trial. *Cf. North Carolina v. Pearce*, 395 U.S. 711, 725, 89 S.Ct. 2072, 2080, 23 L.Ed.2d 656 (1969) (the process requires that a defendant be freed of apprehension of a retaliatory motivation on the part of the sentencing judge). Nonetheless, this concern carries somewhat less significance because the right to a trial by jury, which was exercised in the instant case, should enjoy a more protected status. The defendant has less cause to complain when, in fact, he has received the full panoply of these procedural protections. More importantly, in the instant case there is no indication of any objective deception, whether conscious or not. The judge's commentary on the evidence was sufficiently vague, noncommittal, and brief as to preclude reasonable, unscrutinized reliance. That this type of assessment concerns a limited set of external factors, and not personal action within the power of the judge, should also have been taken into account by the defendant and his attorney. (The court recessed for approximately 55 minutes after these remarks.) Although the statement as to the likely sentence is more problematic, because it may have intruded too far into the issue of plea negotiations, it is also reasonable in view of the fact that the judge had not actually reached the point of deciding what particular sentence to impose on German. Further, the judge's commentary concluded with the statement that he had no opinion whether German was guilty and was ready to proceed to trial. German had to understand the context of these remarks and the limited nature of what the judge was saying. Nothing in the record indicates that the judge was making anything more than a limited prediction,[9] rather than a specific and personal promise. *Compare Adams, supra*, 634 F.2d at 833 ("I would sentence you to four years on one count"). The statement, at most, was a reasonably based projection, and not coercion, which left the defendant, with the aid of counsel, free to make a well-informed, voluntary decision. *See Byrd, supra*, 377 A.2d at 404 (participation neutral).

The list of Rule 11's core concerns is somewhat different when the defendant has in fact pleaded not guilty and has received a full trial. The *Adams* court stated that the "judge who suggests or encourages a particular plea bargain may feel a personal stake in the agreement ... and may therefore resent the defendant who rejects his advice." *Id.* at 840. The court concluded that a new trial would be unnecessary but that resentencing before a new judge would satisfy the defendant's concerns, and would "provide an important measure of protection against judicial participation in plea discussions." *Id.* at 842. The selection of a proper remedy to protect against this core concern, thus, merges into the question whether the defendant has been penalized for exercising his sixth amendment right to a jury trial. Although case law has contemplated the remedy of resentencing by a different judge, the harmless error standard of Rule 11(h) would limit the scope of review to those

---

9. Even if it were a close question of interpretation, the issue is resolved in favor of the judge whenever there are two "equally possible" interpretations. *Hebble v. United States*, 257 A.2d 483, 486 (D.C.1969).

cases in which the judge has imposed a harsher sentence out of vindictiveness, *see Frank v. Blackburn, supra,* 646 F.2d at 885, or as punishment for a lack of remorse as demonstrated by the decision not to plead guilty, which effectively achieves the same result. *See Hebble, supra* note 9, 257 A.2d at 486; *Miler v. United States,* 255 A.2d 497, 498 (D.C.1969); *United States v. Stockwell,* 472 F.2d 1186, 1187 (9th Cir.), *cert. denied,* 411 U.S. 948, 93 S.Ct. 1924, 36 L.Ed.2d 409 (1973) (sentencing power can be used as a carrot, not as a stick, and only with respect to post-conviction remorse). Therefore, the same standards and case law can be employed to determine both the Rule 11 inquiry and the constitutional question whether German has been improperly penalized for exercising his sixth amendment right to a trial by jury.

■ To succeed on this claim, a defendant must affirmatively demonstrate "a reasonable likelihood of vindictiveness" [10] on the part of the trial judge.[11] *Frank v. Blackburn, supra,* 646 F.2d at 886; *see also Damiano v. Gaughan, supra* note 6, 770 F.2d at 3. There is no such direct evidence in the instant case. Indeed, the judge's pretrial statements would seem to have the effect of encouraging the defendant to proceed to trial. The judge further indicated his willingness to try the case when he called it "far more interesting than the usual drug dealing." Absent other circumstances, these statements are entitled to be accepted on their face. *See Frank v. Blackburn,* 605 F.2d 910, 915 (5th

Cir.1979). The only possible way of showing vindictiveness would require an inference from the discrepancy between the judge's pretrial statements and the actual sentence and the fact that the judge had sat through an earlier hearing of the same case that ended in a mistrial. But the mere fact of a sentence increase does not show vindictiveness. *Frank v. Blackburn, supra,* 646 F.2d at 885 (33 year sentence imposed after 20 year sentence promised for plea).

Because German has failed to show that all relevant information and evidence in the second trial was identical to the evidence introduced at the mistrial, the court must assume that the sentence was based on the judge's "more accurate appraisal of the circumstances after hearing the full disclosure of the facts at trial." *Id.; see also United States v. Cunningham,* 529 F.2d 884, 889 (6th Cir.1976). Here, although the second trial was basically a rerun of the government's evidence at the first trial, German did not testify at the second trial. Most importantly, the judge had not previously been forced to choose an actual sentence to impose on German.[12] Nor had the judge heard the government's allocution urging incarceration or seen the presentence report. Admittedly, the judge's remarks at sentencing suggest some impatience with the fact German had insisted on a second lengthy trial and reveal his mistaken recollection of his pretrial statements.[13] In some respects, too, the re-

10. WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (1971) defines "vindictiveness" in terms of a disposition to seek revenge; the intent to cause anguish or hurt.

11. In *Stockwell, supra,* 472 F.2d at 1187, the court required the government to rebut an inference that the defendant had been punished. The case is distinguishable, however, because Stockwell showed that the judge had spelled out clear, specific sentencing consequences that would attach to the defendant's decision either to plead guilty or to go to trial, and had then acted consistently with the identified plan. In the instant case, the judge predicted only that sentencing might be mild.

12. That the judge previously had not come to grips with the sentence to impose on German is further indicated by the judge's denial at the

sentencing hearing that he had stated prior to trial the crime was not the type of offense that would require incarceration. *See infra* note 13.

13. At sentencing, when German's counsel referred to the trial judge's pretrial remark that trafficking was not the type of offense which would require incarceration, the trial judge responded: "No, that is not what I said. What I said was that I would not be offended if he accepted—the Government accepted a plea of two Misdemeanors; go ahead—or three Misdemeanors. But your client declined that and insisted that the matter be tried at length and allowed me to hear all the details of the offense a second time." The judge also commented that he thought German had delayed the retrial to prolong the inevitable and, in denying German's motion to reconsider releasing him on bond

marks approach an area of forbidden judicial motivation. *See Hebble, supra* note 9, 257 A.2d at 486 (quoting *Scott v. United States*, 136 U.S.App.D.C. 377, 380, 419 F.2d 264, 267 (1969)).

That the trial judge reassessed his evaluation of the seriousness of the crimes is nonetheless clear from the record. The judge referred at the sentencing hearing to three circumstances. First, he emphasized German's boast, on tape, that he had been dealing in stolen property for fifteen years and that he was willing to receive such property at any time. Second, the judge appeared to have come to a fuller appreciation of the extent to which fencing facilitates other criminal activities. The judge had previously noted, in denying a motion for reconsideration of bond pending sentence, that since German did not testify at the second trial, the government's evidence was left "virtually uncontradicted." [14] Third, the judge considered Germans' prior federal conviction for burglary. Finally, the judge indicated that he had thought "long and hard" about the sentence. Viewing all the circumstances, and in recognition of the substantial trust that our system of criminal justice places in the trial judge to make every reasonable effort to maintain the requisite neutrality, we conclude that German has failed to meet his burden to show that the trial judge should be limited by his pretrial statements, however unfortunate. *Cf. Frank v. Blackburn, supra*, 646 F.2d at 878 ("Once the defendant elects to go to trial, all bets are off.").

### III. *Validity of Statute.*

#### A.

■ German first contends that the trafficking statute, D.C.Code § 22–3831 (1986

Supp.), is "void, illegal and unconstitutional" because the Secretary of the Council of the District of Columbia did not accurately "verify," or attach a signature, to the documentation of the vote count at required readings of the bill, and also did not verify the reading at all until the final reading. D.C.Code § 1–229(a) (1986 Supp.) requires that a proposed act be read twice publicly, in substantially the same form, with at least thirteen days intervening between each reading. German does not contest that the reading requirements were in fact satisfied; he only challenges the lack of verification, without citing any authority. Thus his argument borders on the frivolous. The D.C. Council simply has imposed a duty on its Secretary to maintain accurate and up-to-date records, see id. §§ 1–227, subsec. 441(a), 445, 446 (1981 & 1986 Supp.), and has thereby neither expressly directed a means of formal verification nor established a precondition to the authoritative passage of public laws. *Cf. Pillis v. District of Columbia Hackers' License Appeal Board*, 366 A.2d 1094 (D.C.1976) (typographical error does not affect validity of enactment), *cert. denied*, 430 U.S. 937, 97 S.Ct. 1566, 51 L.Ed.2d 784 (1977). Moreover, even if a verification requirement existed it could hardly have been intended to protect potential violators of this law, and therefore, any breach could not be challenged by a citizen in German's position. *See Dimond v. District of Columbia*, 253 U.S.App.D.C. 111, 122–23, 792 F.2d 179, 190–91 (1986) (litigant must be directly and adversely affected).

#### B.

■ German next contends that the trafficking statute [15] is both unconstitutionally

---

pending sentencing, the judge observed that imposition of a "significant term of confinement is not unlikely."

**14.** The trial judge commented, in connection with German's requested instruction on entrapment, *see infra* Part V B, that "[t]he evidence of entrapment was very strong in the [first trial], but most of it came from Mr. German, who described it very cavalierly as to what happened."

**15.** D.C.Code § 22–3831 provides:

Trafficking in stolen property.
(a) For the purposes of this section, the term "traffics" means:
(1) To sell, pledge, transfer, distribute, dispense, or otherwise dispose of property to another person as consideration for anything of value; or
(2) To buy, receive, possess, or obtain control of property with intent to do any of the acts set forth in paragraph (1) of this subsection.

overbroad and vague. On the overbreadth claim, he contends that subsection (b), allowing conviction when the property is not actually stolen, could easily include within its ambit the legitimate activities of any pawn or junk shop. Because the trafficking statute does not implicate first amendment concerns, however, *see City Council of Los Angeles v. Taxpayers for Vincent,* 466 U.S. 789, 798, 104 S.Ct. 2118, 2125, 80 L.Ed.2d 772 (1984), German does not have standing to assert the rights and interests of third parties who might be unconstitutionally affected by the statute. *See New York v. Ferber,* 458 U.S. 747, 767–68, 102 S.Ct. 3348, 3359–60, 73 L.Ed.2d 1113 (1982); *Broadrick v. Oklahoma,* 413 U.S. 601, 613, 93 S.Ct. 2908, 2916, 37 L.Ed.2d 830 (1973).[16]

Similarly, German has standing to challenge the statute on the grounds that it is unconstitutionally vague,[17] *see Lanzetta v. New Jersey,* 306 U.S. 451, 59 S.Ct. 618, 83 L.Ed. 888 (1939) (guessing at meaning of word "gang"), only as it applies to him. *United States v. Mazurie,* 419 U.S. 544, 550, 95 S.Ct. 710, 714, 42 L.Ed.2d 706 (1975) ("vagueness challenges to statutes that do not involve First Amendment freedoms must be examined in light of the facts of the case at hand"); *see also United States v. National Dairy Products,* 372 U.S. 29, 83 S.Ct. 594, 9 L.Ed.2d 561 (1963). "Void

for vagueness simply means that criminal responsibility should not attach where one could not reasonably understand that *his contemplated conduct* is proscribed." *Id.* at 32–33, 83 S.Ct. at 597–98 (emphasis supplied); *see also Papachristou v. City of Jacksonville,* 405 U.S. 156, 162, 92 S.Ct. 839, 843, 31 L.Ed.2d 110 (1972) ("fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute"); *United States v. Harriss,* 347 U.S. 612, 617, 74 S.Ct. 808, 812, 98 L.Ed. 989 (1954). The doctrine guarantees that citizens know what conduct is proscribed and that they may engage in innocent conduct without fear of punishment.[18]

The trafficking statute clearly proscribes the purchase of property if a person knows or has reason to know that it has been stolen even if the property was not in fact stolen. § 22–3831(b). A challenge to this statute can be made on the grounds that citizens who might engage in innocent sales of property are subject to unreasonable risks of arrest, prosecution, and conviction. Arguably the "nonstolen goods" amendment increases this uncertainty. The legislative history makes it clear, however, that nonstolen property was included to facilitate police undercover investiga-

---

(b) A person commits the offense of trafficking in stolen property if, on 2 or more separate occasions, that person traffics in stolen property, knowing or having reason to believe that the property has been stolen.

(c) It shall not be a defense to a prosecution under this section that the property was not in fact stolen, if the accused engages in conduct which would constitute the crime if the attendant circumstances were as the accused believed them to be.

(d) Any person convicted of trafficking in stolen property shall be fined not more than $10,000 or imprisoned for not more than 10 years, or both.

16. *See generally State v. Tomas,* 370 So.2d 1142 (Fla.1979) (upholding Florida's trafficking in stolen goods statute against overbreadth challenge).

17. The government's cite to *County Court of Ulster v. Allen,* 442 U.S. 140, 154–55, 99 S.Ct. 2213, 2223 60 L.Ed.2d 777 (1979) is unresponsive to the issue of standing to challenge a statute on vagueness grounds.

18. The concerns of the void-for-vagueness doctrine are two-fold where, as in the instant case, the challenged law does not intrude upon first amendment values. The Supreme Court has written:

Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application.

*Grayned v. City of Rockford,* 408 U.S. 104, 108–09, 92 S.Ct. 2294, 2298–99, 33 L.Ed.2d 222 (1972) (citations omitted).

tions of professional fences. *See* Report of the Committee on the Judiciary on Bill No. 4–133, the District of Columbia Theft and White Collar Crime Act of 1982, at 16 (D.C. June 1, 1982). In fact, the actual status of the stolen property does little, if anything, to increase the uncertainty facing a prospective purchaser. The key element of the crime is "reason to know" that the goods are stolen. If the purchaser has no such reason, then it makes little predictive difference whether the goods are in fact stolen. The police are given greater capabilities by the statute, but the stolen/nonstolen distinction in itself does not give them, or the judicial system, greater abilities to define the scope of the offense as it is applied.[19]

The statute, then, must be analyzed no differently than a statute without the nonstolen goods provision. The criminality of one's behavior is sufficiently predictable under the "reason to know" standard because of the specific intent requirement, *see Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 499, 102 S.Ct. 1186, 1193, 71 L.Ed.2d 362 (1982) (scienter requirement mitigates vagueness), and the necessity for the purchaser to engage in some overt act indicating such intent in order to satisfy the quantum of proof required for conviction. The need to elicit such an act does not sanction or promote erratic or arbitrary arrests. *See Kolender v. Lawson,* 461 U.S. 352, 360, 103 S.Ct. 1855, 1859, 75 L.Ed.2d 903 (1983). Moreover, the jury's inquiry into knowledge and criminal intent is quite typical of many other crimes, such as drug possession or attempted solicitation.

In any event, German's activities fall squarely and unambiguously within the terms of § 22–3831. The finding of an intent to deal in stolen goods is supported by the evidence: Officer Archer made clear and repeated statements to German about the specific, stolen origin of the goods, and German made several statements that would demonstrate both an unquestioning acceptance of these remarks and an acumen that would come only from substantial experience in handling stolen property.

### C.

German challenges subsection (c) of the statute on the ground that it unconstitutionally deprived him of the defense of impossibility.[20] § 20–3831(c). The only constitutional law he cites in support of this claim are the due process clause of the fifth amendment and *In re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). *Winship* is irrelevant, however, because there is no contention that the legislature has redefined the crime of trafficking in order to avoid a procedural requirement. German cites no authority [21] for the proposition that the legal or factual impossibility defense is constitutionally protected, and we have found none. A substantive due process challenge to § 22–3831(c) as arbitrary and capricious would readily fail because the statute is rationally related to a legitimate governmental interest, *see Williamson v. Lee Optical,* 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955), and the legislative history reveals that the D.C. Council acted in a rational fashion to alleviate the problems associated with curbing

**19.** We do not address whether the law would apply to certain exchanges with a pawn broker, or between friends where there is a false statement that goods are stolen.

**20.** Legal impossibility occurs when a defendant's actions, or actions a defendant causes, even if fully carried out would not constitute a crime. *United States v. Cohen,* 274 F. 596 (3d Cir.1921); *State v. Hageman,* 307 N.C. 1, 296 S.E.2d 433 (1982). Factual impossibility occurs when the objective of the defendant is proscribed by the criminal law, but a circumstance unknown to the actor prevents him or her from bringing about that objective. *See United States v. Oviedo,* 525 F.2d 881, 883 (5th Cir.1976)

(recognizing legal but not factual impossibility as a defense).

**21.** Although the Chair of the D.C. Council's Judiciary Committee referred, in extended remarks of July 20, 1982, to the Florida statute, the language in the District of Columbia and Florida statutes is not the same. German also erroneously creates the impression that Florida and the District of Columbia are isolated examples. *See State v. Rios,* 409 So.2d 241, 244–45 (Fla. App.) (listing 32 jurisdictions that have rejected the nonstolen goods defense), *rev. denied,* 419 So.2d 1199 (Fla.1982).

fencing operations.[22] *See* Report of the Committee on the Judiciary on Bill No. 4–133, The District of Columbia Theft and White Collar Crime Act of 1982, at 16 (D.C. June 1, 1982). Finally, the fact that the same acts could be punished under an attempt statute[23] completely eliminates any constitutional argument left to German.

## IV. *Admissibility of Evidence.*
### A.

German contends that the trial court erroneously allowed the government, in its case-in-chief, to introduce the testimony of George Melson, who described certain events that would suggest the illegal purchase of food stamps by German. According to German, this testimony was inadmissible evidence of other crimes or bad acts.

"[E]vidence of one crime is inadmissible to prove *disposition* to commit crime, from which the [trier of fact] may infer that the defendant committed the crime charged." *Drew v. United States*, 118 U.S.App.D.C. 11, 15, 331 F.2d 85, 89 (1964) (footnote omitted; emphasis in original). Although we review for abuse of discretion, *e.g.*, *Gates v. United States*, 481 A.2d 120, 123 (D.C.1984), *cert. denied*, 470 U.S. 1058, 105 S.Ct. 1772, 84 L.Ed.2d 832 (1985), the trial court must "presume prejudice and exclude evidence of other crimes," *Drew, supra*, 118 U.S.App.D.C. at 15–16, 331 F.2d at 89–90, unless the evidence "comes under one or more well recognized exceptions" that reflect a legitimate evidentiary purpose, such as to show motive, intent, identity, a common purpose scheme or plan, or absence of mistake or accident. *Willcher v. United States*, 408 A.2d 67, 75 (D.C. 1979). Even when the other crimes evidence satisfied one or more of the exceptions, however, the trial court must exclude the evidence unless, in an exercise of "dis-

cretion separate from the initial *Drew* determinations," the court concludes that the probative value will outweigh the prejudicial impact on the defendant. *Campbell v. United States*, 450 A.2d 428, 430 (D.C. 1982).

There are other exceptions, however. Evidence of a defendant's other criminal activity "is admissible when relevant to explain the *immediate circumstances* surrounding the offense charged and when its probative value outweighs its prejudicial effect." *Green v. United States*, 440 A.2d 1005, 1007 (D.C.1982) (emphasis supplied) (citing *Tabron v. United States*, 410 A.2d 209, 214 (D.C.1979)); *see also Derrington v. United States*, 488 A.2d 1314, 1337–38 (D.C.1985); *Toliver v. United States*, 468 A.2d 958 (D.C.1983). The rationale behind this exception is that the government should not be denied the opportunity to introduce evidence of events that are "intimately entangled with the charged criminal conduct." *Toliver, supra*, 468 A.2d at 960.

A separate set of exceptions arises when the defendant raises a defense that can be rebutted with "other crimes" evidence. For example, invoking the defense of entrapment will permit the government to introduce evidence of predisposition. *United States v. Moore*, 235 U.S.App.D.C. 381, 386, 732 F.2d 983, 988 (1984) (permitting girlfriend to testify about defendant's prior drug sales); *United States v. Tyson*, 152 U.S.App.D.C. 233, 236, 470 F.2d 381, 384 (1972) (per curiam) (evidence of prior conviction for drug possession), *cert. denied*, 410 U.S. 985, 93 S.Ct. 1512, 36 L.Ed.2d 182 (1973). The defendant who chooses to rely on an entrapment defense "cannot complain of an appropriate and searching inquiry into his own conduct and predisposition...." *United States v. Russell*, 411 U.S. 423, 429, 93 S.Ct. 1637, 1641, 36

---

**22.** The government has an obvious, important interest in curbing transactions in stolen goods. Indeed, the interest is particularly strong due to the incentive it creates for individuals to engage in theft. Trafficking laws are not easily enforced, however, because all of the necessary parties are engaged in a consensual arrangement. *See* Heymann, *Understanding Criminal Investigations*, 22 HARV.J. ON LEGIS. 315 (1985). Thus, undercover operations are vital to en-

forcement efforts, *id.*, and the police must necessarily use goods that have lost their "stolen" status.

**23.** D.C.Code § 22–103 (1981) (attempts to commit crime). Indeed, the government argues that subsection (c) effectively incorporated the offense of attempted trafficking within § 22–3831.

L.Ed.2d 366 (1973) (quoting *Sorrells v. United States*, 287 U.S. 435, 451, 53 S.Ct. 210, 216, 77 L.Ed. 413 (1932)). By inference, there will be only rare circumstances, for example where the evidence is cumulative, where the trial court should consider excluding such evidence on the grounds that its prejudicial impact outweighs its probative value.

■ The entrapment exception provides the clearest resolution [24] of this issue.[25] German clearly expressed the intent to raise the defense at trial in his opening statement to the jury, and in fact did so. The issue was sent to the jury.[26] The government has little choice but to introduce rebuttal evidence and cannot be limited to the general standards of admissibility. It is not even crucial that the acts be proved by a preponderance of the evidence because "reasonable suspicion is all that is required to establish predisposition sufficiently to defeat a claim of entrapment." *Tyson, supra*, 152 U.S.App.D.C. at 235 n. 3, 470 F.2d at 383 n. 3 (citing *Childs v. United States*, 105 U.S.App.D.C. 342, 343, 267 F.2d 619, 620 (1958), *cert. denied*, 359 U.S. 948, 79 S.Ct. 730, 3 L.Ed.2d 680 (1959)).

Two possible additional objections to the admission of this evidence on these grounds remain. First, the evidence was introduced in the government's case-in-chief before the entrapment defense had actually been raised. The trial judge thus could not have known that the evidence would have been necessary. Because the mere raising of the entrapment defense is sufficient to justify the introduction of the evidence, however, this court can confidently look to subsequent events and find that this order of presentation, however vital in most cases, *see Graves v. United States*, 515 A.2d 1136, 1143 (D.C.1986) (serious question whether evidence ever admissible unless to rebut a defense), was not required here. Moreover, any assumed error was clearly harmless. *See Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946); *Moore, supra*, 235 U.S.App.D.C. at 386, 732 F.2d at 986–87.

Second, German was deprived of the opportunity to obtain a limiting instruction that the evidence was to be used only to rebut the entrapment defense. Although this court generally will uphold an evidentiary ruling if any grounds are available, this argument points to a specific possibility of prejudice that is traceable to the trial judge's admission of the evidence on alternative grounds, which would have precluded a limiting instruction. In this case, however, the main danger—use of the evidence to infer criminal disposition—was in fact addressed by a limiting instruction.[27] Fur-

24. While Melson's testimony helps explain the origins of the investigation, the evidence of the food stamp sales by Ms. Weems is not really an immediate circumstance that is intimately entangled with the charged criminal conduct. *Compare Derrington, supra*, 488 A.2d at 1337–38 (statements made while planning burglary). The events are unrelated and do not help explain the acts that allegedly constituted the charged crime. Because this type of res gestae evidence is highly prejudicial, its use should be narrowly circumscribed.

25. The trial judge stated the entrapment exception was an alternative ground for admitting the testimony, but our review of the record demonstrates that he placed primary reliance on this theory, stating it was the "obvious" basis on which the evidence was admissible. *See also* note 27, *infra*.

26. There is some indication in the case law that rebuttal evidence may be introduced only when there is sufficient evidence to submit the entrapment issue to the jury. *See Hansford v. United*

*States*, 112 U.S.App.D.C. 359, 365–66, 303 F.2d 219, 225–26 (D.C.Cir.1962). Although the evidence in this case was not strong due to the failure of German to testify, it was still sufficient to send the entrapment issue to the jury, as was done at German's request.

27. As part of the general instructions to the jury, the trial judge stated:

Now, if evidence of prior conduct of the defendant which may be criminal, is introduced to show his predisposition or willingness to commit the alleged offense, you may consider such evidence only in connection with your determinations of the defendants' predisposition or readiness to commit the offense. It is not evidence that Mr. German or Mr. Henson actually committed the crimes for which they are now on trial. And, moreover, the fact, if it is a fact, that the defendant may have committed prior offenses of similar character doesn't by itself require you to conclude that a predisposition or readiness to commit the offense with which they are now charged.

ther, the jury was never instructed that it could consider the other crimes testimony as evidence of intent. Because the entrapment instructions contained strong admonitions that the testimony was not evidence that the charged offense was committed, a reasonable juror would have concluded that the evidence could be permissibly used only to show predisposition, and not the specific element of intent.[28] Jurors are presumed to follow instructions. *Hairston v. United States,* 497 A.2d 1097, 1103 (D.C.1985).

### B.

German also claims that the trial court erred in refusing to allow the introduction, through his accountant, of his tax returns for the years 1981 and 1982. He claims that these returns would have shown him to be in good financial condition, which would reduce his motive to engage in crime for profit.

Even in a criminal case, "an evidentiary ruling by a trial judge on the relevancy of a particular item is a highly discretionary decision which will be upset on appeal only upon a showing of 'grave abuse.'" *Mitchell v. United States,* 408 A.2d 1213, 1215 (D.C.1979). It is always permissible to exclude irrelevant or insufficiently probative evidence, *see Geders v. United States,* 425 U.S. 80, 86–87, 96 S.Ct. 1330, 1334, 47 L.Ed.2d 592 (1976); *McClain v. United States,* 460 A.2d 562, 569 (D.C. 1983) (excluding impeachment evidence). Constitutional rights are violated only when the proffered evidence is direct and material, as, for example, when "the State arbitrarily [denies] the right to put on the stand a witness who was physically and mentally capable of testifying to events that he personally observed, and whose testimony would have been relevant and material to the defense." *Washington v. Texas,* 388 U.S. 14, 23, 87 S.Ct. 1920, 1925, 18 L.Ed.2d 1019 (1967). Here, the rele-

vance of the income tax returns depended on establishing as a foundation that persons of German's wealth have a reduced motivation to engage in crime for profit and that accordingly they commit fewer such crimes. Even if assumed, the probativeness of this generalization pales in comparison to more case-specific evidence, which could easily rebut the generalization in an individual case. Moreover, this type of evidence would more likely confuse the jury, *cf. United States v. Oxman,* 740 F.2d 1298, 1303 (3d Cir.1984) (affirming exclusion of evidence of financial status of subsidiary company), *vacated on other grounds sub nom. United States v. Pflaumer,* 473 U.S. 922, 105 S.Ct. 3550, 87 L.Ed.2d 673 (1985), and leave the trial judge with no effective control over the conduct of the trial. We find no abuse of discretion, much less harmful error.

### C.

German's final evidentiary claim of error is that there was insufficient proof of the "chain of custody" to allow the introduction into evidence of a tape recording (and a copy and a written transcript thereof) of a conversation between himself and undercover Detective Archer. In support of his contention that the evidence of authenticity was not clear and convincing, he relies on the lack of markings on the original tape, the fact that the transcript of a copy of the tape was prepared two years after the tape was made, and the fact that an unauthenticated copy of the tape was played to the jury.

This court has stated clearly that the admission of tape recordings at trial is a matter committed to the sound discretion of the trial judge. *Springer v. United States,* 388 A.2d 846, 852 (D.C.1978). The trial court must simply determine "whether the government has met its burden of showing by clear and convincing evi-

---

**28.** There is also not a significant possibility that, prior to the closing instructions, the jury would have concluded that the evidence could be used to show intent. This court must form its own impressions on the basis of a review of the entire record. *See Johnson v. United States,* 318 U.S. 189, 202, 63 S.Ct. 549, 555, 87 L.Ed. 704 (1943) (Frankfurter, J., concurring) ("In reviewing criminal cases, it is particularly important for appellate courts to relive the whole trial imaginatively and not to extract from episodes in isolation abstract questions of evidence and procedure.").

dence—which may be direct or circumstantial—that the tapes are authentic, accurate, and trustworthy." *Id.* It is up to the defendant to introduce evidence that the routine handling of the evidence by the government did not suitably preserve the original. Typically, the defendants must rebut this presumption by making "a minimal showing of ill will, bad faith, other evil motivation, or some evidence of tampering." *United States v. Lane,* 192 U.S.App. D.C. 352, 353, 591 F.2d 961, 962 (1979) (quoting *United States v. Daughtry,* 502 F.2d 1019, 1021 (5th Cir.1974)); *see also Ford v. United States,* 396 A.2d 191, 194 (D.C.1978).

Beyond implying bad faith, German offered no evidence whatsoever to suggest that the original recording was altered or misidentified. Officer Archer, who was fitted with a body recording device, testified that he could not be sure from its external appearances that an identified tape was the original, but the record shows that the tape was handled according to routine and reliable police procedures, as was the taping of the copy, that there was a continuous chain of custody, and that nothing likely to cause an error occurred. Two other police officers testified that the tape was the original, and Archer identified the contents of the tape. The government "need not rule out every conceivable chance that somehow the identity or character of the evidence underwent change." *Lane, supra,* 192 U.S.App. D.C. at 353, 591 F.2d at 962. More importantly, Archer testified that the copy fairly and accurately represented the conversation he had with German on February 10, 1983. The trial court found that there was clear and convincing evidence to establish the admissibility of both tapes.[29]

The admission of the transcript of a copy is somewhat more problematic because it is not a duplicate. Archer prepared the transcript in 1985 and testified that it represented a true and accurate copy of the original conversation. This testimony satisfied the authentication requirement, and, under District of Columbia law, the *"admission* of accurate transcripts as an aid in listening to tape recordings is similarly committed to the trial judge's discretion." *Springer, supra,* 388 A.2d at 853. Here, the trial court instructed the jury, before it heard the tape or read the transcript of the tape, that only the tape was evidence, and not the transcript which was admitted for the jurors' convenience in listening to the tape; the transcripts were retrieved from the jury after the tape was played. Moreover, the introduction into evidence of the tape copy would nonetheless render the admission of the transcript a harmless error. German's counsel admitted after listening to the tape out of the jury's presence that the transcript was "a pretty good representation of what's on the tape." [30]

## V. *Jury Instructions.*

### A.

German challenges the refusal of the trial court to give a requested "missing

---

**29.** Defense counsel also invoked the best evidence rule as a separate ground for objection, but has not pursued this claim on appeal. This argument would easily lose under the modern version of the best evidence rule. FED.R.EVID. 1003; *Myrick v. United States,* 332 F.2d 279 (5th Cir.1964) (citing 28 U.S.C. § 1732). Moreover, the original tape was produced at trial and identified by the police.

**30.** German also maintains that there was an unconstitutional search and seizure of allegedly stolen items from his Maryland residence. These items were not introduced at trial and the government made no reference to their recovery. German nonetheless challenges the extensive references to the goods themselves by the government witness, Officer Archer, who had been involved in the undercover operation. Archer's testimony related to events on January 4 and February 10, 1983, occurring before the search on February 15, 1983. This type of commentary does not implicate the concerns of the fourth amendment: the use of the goods and testimony thereto was completely independent of the search and seizure. *Maryland v. Macon,* 472 U.S. 463, 468, 105 S.Ct. 2778, 2781, 86 L.Ed.2d 370 (1985) (exclusionary rule does not reach backward to taint information in official hands before any illegality) (quoting *United States v. Crews,* 445 U.S. 463, 475, 100 S.Ct. 1244, 1252, 63 L.Ed.2d 537 (1980) (Brennan, J., joined by Stewart & Stevens, JJ.)). Accordingly, the constitutionality of the search is irrelevant to the instant criminal proceedings, particularly in light of the fact that the only potential remedy, exclusion of the goods themselves, would be meaningless.

witness" jury instruction concerning a government witness, Russell Anderson, the Department of Agriculture employee who was present on the first undercover trip to German's store. Anderson had been placed in the federal Witness Protection Program in December of 1983, but later voluntarily withdrew from it. He had returned to Washington, but repeated attempts by the police, the Secret Service, and the U.S. Marshal's Service to locate him were unsuccessful. The trial judge found that Anderson was unavailable to both the government and the defense. German nonetheless requested an instruction that the failure to produce Anderson may create a negative inference against the government as to what his testimony might have been.

The party who seeks a missing witness instruction must first establish: (1) that the witness is "peculiarly available" to the party against whom the inference is sought to be made; and (2) that the witness' testimony would be likely to elucidate the transaction at issue. *Miles v. United States,* 483 A.2d 649, 657–58 (D.C.1984); *see also Graves v. United States,* 150 U.S. 118, 121, 14 S.Ct. 40, 41, 37 L.Ed. 1021 (1893); *Thomas v. United States,* 447 A.2d 52, 57 (D.C.1982); *Cooper v. United States,* 415 A.2d 528, 533 (D.C.1980). Because Anderson cannot be located and cannot be brought to court, no factual conclusion can be drawn from the failure to produce him. *Thomas, supra,* 447 A.2d at 57. German gives this court no reason [31] to suspect the validity of the trial judge's determination that Anderson is unavailable despite reasonable, good faith efforts by the government to locate him, and we find substantial evidence in the record to support that finding.

Furthermore, German cannot show that Anderson's testimony would "elucidate the transaction." The requesting party must show that "the witness' testimony would be important to the defendant's case, would be noncumulative, or would otherwise be

superior to other testimony already given on the matter." *Miles, supra,* 483 A.2d at 658. German offers nothing but rank and unspecified speculation upon which to gauge the contribution that might be made by Anderson's testimony; at trial defense counsel admitted he did not know what Anderson's testimony would be. Anderson's testimony may well have been favorable to German, but this court must require, at a minimum, that some reasonable, concrete basis for this suspicion be articulated and supported. "Unless it can be established that the witness in question would provide new or additional evidence or would be manifestly more credible, we risk considerable unfairness by using the missing witness instruction to create adverse evidence." *Cooper, supra,* 415 A.2d at 534. The trial judge reviewed the credibility of testimony by other government witnesses and Anderson's role as a government agent, and concluded that his testimony would be cumulative and that there was "no factual basis for believing Mr. Anderson would testify unfavorably to the government...."

Still, even where both prongs are satisfied, the trial judge retains the discretion to refuse the instruction. *See Miles, supra,* 483 A.2d at 658. We hold the trial court acted properly and did not abuse his discretion. *See Leftwich v. United States,* 460 A.2d 993, 995 (D.C.1983).

**B.**

Finally, German contends that the trial court erred by refusing to supplement the standard "Red Book" jury instruction on entrapment. *See* Criminal Jury Instructions for the District of Columbia, No. 5.05 (3d ed. 1978). He requested that the following instruction be added:

Before police authorities may invite one to engage in any particular criminal behavior, they must have reasonable suspicion to believe that he is engaging in such conduct. *Childs v. United States,*

---

**31.** Defense counsel merely characterized as insufficient, in view of the resources available to it, the government's efforts to locate Anderson

by means of "a couple of cursory attempts and one visit to the last known location."

[105 U.S.App.D.C. 342], 267 F.2d 619 (1958).

If you are not convinced beyond a reasonable doubt that the police in this case, on January 4, 1983, had reasonable suspicion to believe Mr. German was engaged in trafficking in stolen property (or a similar offense), then you must find the defendant not guilty.

The trial judge denied the requested jury instruction on the ground that the issue was a legal matter[32] for him to determine before allowing the issue to go to the jury, and that he had already decided that issue in favor of the government.[33] The court must reach a determination of the proper legal standards, however, because even if a lack of reasonable suspicion constituted a ground for a directed verdict, see Childs, supra, 105 U.S.App.D.C. at 343, 267 F.2d at 620, the jury would be entitled to determine the issue of reasonable suspicion if it were an alternative means of establishing an entrapment defense.

■■■ We hold that the government need not have reasonable suspicion of similar criminal activity prior to conducting an investigation in order to avoid an entrapment defense.[34] This view has been anticipated

---

32. "Entrapment as a matter of law" can describe a situation in which "the evidence of predisposition was insufficient as a matter of law to permit the jury to find that the prosecution has proved predisposition as a matter of fact." United States v. Myers, 692 F.2d 823, 836 n. 8 (2d Cir.1982), cert. denied, 461 U.S. 961, 103 S.Ct. 2437, 77 L.Ed.2d 1322 (1983). "Entrapment as a matter of law" could also refer to the possibility that, where police conduct has been sufficiently outrageous, due process principles might prevent conviction even though the defendant was predisposed to commit the crime. Hampton v. United States, 425 U.S. 484, 491, 96 S.Ct. 1646, 1650–51, 48 L.Ed.2d 113 (1976) (Powell, J., joined by Blackmun, J., concurring). See Williams v. United States, 342 A.2d 367, 370 (D.C.1975). In the instant case, a review of the record and the trial judge's reference to German's cited case of Childs, supra, leaves no doubt that the judge was addressing, as a matter of law, the issue whether the government had a reasonable suspicion if such were required as an alternative element of the defense of entrapment. According to his own understanding, the judge ruled that the police did have reasonable suspicion.

33. The trial judge stated:

With all deference, it would seem to me for purposes of deciding whether to go forward with an investigation, information that the defendant is misusing food stamps, in other words, taking them lawfully and illegally, seems to me—and for cash, is sufficiently close to the suggestion that he was also taking other property that he shouldn't, to allow the police to investigate further.

Second, the evidence that was presented to the Agriculture Department, I gather, was, one, assuming it was the same as it was on the stand, this isn't just one case; this is a citizen who came in unsolicited. He is not a police informant. He was not urged to do this. He voluntarily came in, and he told, presumably, Mr. Bowling the same information that he testified to on the stand.

I have no reason to believe otherwise. What he testified to on the stand, it seems to me, is sufficient to show there is probable cause at this point to believe that an offense has been committed, and that the defendant involved is committing it.

And accordingly, if probable cause is needed for this event, the matters are not certain because what the [Childs] Court says depends, at least to some degree on the facts of the case. I don't know what the facts are on this case, since we have [only] the conclusory report of the [D.C. Circuit] Court of Appeals [per] curiam. Nonetheless, I would believe there is sufficient probable cause to commence the investigation in this case.... The motion is denied.

34. The government alternatively argued, erroneously, that German was not entitled to a jury instruction on entrapment. The defense raised the argument that German was entrapped on January 4, 1983, and presented two apparently credible witnesses who testified that German was presented with a "sob story" that the vendor was selling Christmas gifts in order to pay rent and thereby avoid eviction. Moreover, the testimony of the character witness can properly be construed as evidence negating German's propensity to make illegal purchases of property. See Sorrells v. United States, 287 U.S. 435, 451, 53 S.Ct. 210, 216, 77 L.Ed. 413 (1932) ("Controlling question [is] whether the defendant is a person otherwise innocent whom the Government is seeking to punish for an alleged offense which is the product of the creative activity of its own officials"); see also Montgomery v. United States, 384 A.2d 655, 660 (D.C.1978) (general standard for establishing entitlement to instruction); United States v. Burkley, 192 U.S.App.D.C. 294, 305–06, 591 F.2d 903, 914–15 (1978), cert. denied, 440 U.S. 966, 99 S.Ct. 1516, 59 L.Ed.2d 782 (1979) (when entrapment instruction should be given). Entrapment is ordinarily an issue for the jury, United States v. Jannotti, 673 F.2d 578, 597 (3d Cir.), cert. denied, 457 U.S. 1106, 102 S.Ct. 2906, 73 L.Ed.2d 1315 (1982), and the trial judge properly submitted the issue to the jury in the instant case.

by an earlier decision of this court, *see Johnson v. United States*, 387 A.2d 1108, 1110–11 (D.C.1978) ("Operation Sting"),[35] and is consistent with the holdings of other courts.[36] Rejection of the "reasonable suspicion" requirement is consistent with the focus and development of the entrapment doctrine. In *United States v. Russell*, 411 U.S. 423, 433, 93 S.Ct. 1637, 1643, 36 L.Ed.2d 366 (1973), the Supreme Court stated that the central concern of the entrapment defense is the "defendant's predisposition to commit the crime," and expressly rejected the argument that the focus is on the conduct of law enforcement officials. *Id.* at 435, 93 S.Ct. at 1644. For the purpose of meting out just punishment for criminal acts, the goal of avoiding unfair inducement is adequately satisfied without requiring reasonable suspicion in addition to predisposition. *See Hampton v. United States*, 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976) (narrowing importance of government conduct to entrapment defense); *see also Jannotti, supra* note 38, 673 F.2d at 609 (in absence of conduct of the investigation offensive to the defendant's right to due process of law, the conviction is not barred). German makes no claim that he was a target.[37]

German's reliance on *Childs, supra,* is misplaced since it held only that probable cause is not required, noting that reasonable suspicion is enough, and on review of the denial of a directed verdict did not have to reach the issue whether reasonable suspicion was an independent requirement. Indeed in one of the cases cited in *Childs,* the court expressly rejected the position taken by German in this appeal. *United States v. Abdallah,* 149 F.2d 219, 222 n. 1 (2nd Cir.), *cert. denied,* 326 U.S. 724, 66 S.Ct. 29, 90 L.Ed. 429 (1945) (cited in *Childs, supra,* 105 U.S.App.D.C. at 343, 267 F.2d at 620). As subsequently stated by the U.S. Court of Appeals for the District of Columbia Circuit, *Childs* stands for the proposition that "reasonable suspicion is all that is required to establish predisposition sufficiently to defeat a claim of entrapment." *Tyson, supra,* 152 U.S.App. D.C. at 235 n. 3, 470 F.2d at 383 n. 3; *see also Hunt v. United States,* 103 U.S.App. D.C. 309, 258 F.2d 161 (1958) (per curiam), *cert. denied,* 358 U.S. 936, 79 S.Ct. 326, 3 L.Ed.2d 308 (1959). Predisposition can be proved by other means. *See Burkley, supra* note 34, 192 U.S.App.D.C. at 307, 591 F.2d at 991 (citing *United States v. Rodrigues,* 433 F.2d 760 (1st Cir.1970), *cert. denied,* 401 U.S. 943, 91 S.Ct. 950, 28 L.Ed.2d 224 (1971)).

Accordingly, the judgment is affirmed.

*Affirmed.*

PRYOR, Chief Judge, concurring:

I concur in the majority opinion. It is my view, however, that the inquiry of the trial judge regarding the possibility of a disposition in the case does not constitute "judicial participation" in a plea bargain. Accordingly, I find no error in that respect.

---

**35.** In *Burkley, supra* note 34, 192 U.S.App. at 294, 303–04, 591 F.2d at 913–14, the U.S. Court of Appeals for the D.C. Circuit expressly approved the language of the Red Book jury instructions, but has not faced this argument directly, although noting that other circuits have rejected the contention. *See United States v. Kelly,* 228 U.S.App.D.C. 55, 66 n. 58, 707 F.2d 1460, 1471 n. 58, *cert. denied,* 464 U.S. 908, 104 S.Ct. 264, 78 L.Ed.2d 247 (1983).

**36.** *See, e.g., United States v. Espinal,* 757 F.2d 423, 426 (1st Cir.1985); *United States v. Whiting,* 321 F.2d 72, 76–77 (1st Cir.), *cert. denied,* 375 U.S. 884, 84 S.Ct. 158, 11 L.Ed.2d 114 (1963); *Jannotti, supra* note 34, 673 F.2d at 609; *United*

*States v. Swets,* 563 F.2d 989, 991 (10th Cir. 1977) (en banc), *cert. denied,* 434 U.S. 1022, 98 S.Ct. 748, 54 L.Ed.2d 770 (1978); *cf. United States v. Myers,* 635 F.2d 932, 941 (2d Cir.), *cert. denied,* 449 U.S. 956, 101 S.Ct. 364, 66 L.Ed.2d 221 (1980).

**37.** We also note that the evidence in the instant case clearly and convincingly demonstrates the existence of a reasonable suspicion that German was engaged in regular illegal purchases through his grocery store, as the trial judge purported to decide as a matter of law. The testimony of George Melson alone would be adequate to support a jury finding on this issue, had one been made.