**Richard COOPER, Appellant,**

v.

**UNITED STATES of America, Appellee.**

**No. 13531.**

District of Columbia Court of Appeals.

Argued Oct. 18, 1979.

Decided May 15, 1980.

Allan M. Palmer, Washington, D. C., for appellant.

John H. Sturc, Asst. U. S. Atty., Washington, D. C., with whom Carl S. Rauh, U. S. Atty., Washington, D. C., at the time the brief was filed and the case was argued, John A. Terry, Michael W. Farrell, and James F. Hibey, Asst. U. S. Attys., Washington, D. C., were on the brief, for appellee.

Before NEWMAN, Chief Judge, FERREN, Associate Judge and KESSLER, Associate Judge, Superior Court of the District of Columbia.*

* Sitting by designation pursuant to D.C.Code 1973, § 11–707(a).

KESSLER, Associate Judge:

Appellant seeks reversal of his convictions, after a trial by jury, of first degree burglary while armed (D.C.Code 1973, §§ 22–1801(a), –3203), four counts of armed robbery (D.C.Code 1973, §§ 22–2901, –3202), and four counts of assault with a dangerous weapon (D.C.Code 1973, § 22–502).[1] On appeal, he assigns as error (1) the "missing witness" instruction given to the jury by the trial court, and (2) the failure of the trial court either to conduct a full inquiry into the accuracy of certain records which were germane to the testimony of a crucial defense alibi witness or to declare a mistrial. We conclude that even though it was error to give the missing witness instruction in this case, such error was harmless and that the defense request for a mistrial was properly denied. Therefore, we affirm.

## I.

On December 8, 1976 at approximately 12:00 midnight Claude Hunter was asleep in his home at 1517 K Street, Southeast, Washington, D.C. when he was awakened by a knock at his front door. He went to the door where he saw Sharon Henderson, an acquaintance of several years. As Mr. Hunter opened the door to admit her, a man with a shotgun, followed by three other men, rushed inside. Mr. Hunter was ordered at gunpoint to be seated on the living room couch. He was watched by two of the assailants while the man with the shotgun and the man later identified as appellant went upstairs.

Ronnie Peoples and his girlfriend, Barbara Hunter, were asleep upstairs. They were awakened when the assailants knocked on the bedroom door and called, "This is James, let me in." Mr. Peoples opened the door and was confronted by the man with the shotgun and allegedly by appellant, who was carrying a pistol. Mr. Peoples and Ms. Hunter were ordered downstairs and seated on the couch with Mr. Hunter. The assailant identified as appellant and two others ransacked the house while the victims were guarded by the man with the shotgun. Several items of value were taken including Mr. Peoples' watch, leather coat, citizen's band radio, and money; Mr. Hunter's Air Force jacket, citizen's band radio and microphone, money and food; and, Ms. Hunter's watch, leather bag, and clock.

While the robbery was in progress a friend of the victims, William Walker, came in and he too was detained and robbed.[2]

The robbery lasted approximately forty-five minutes to an hour. The house was well lit and the robbers did not wear masks. Before leaving, the assailants tied the victims up with cord that they cut from the venetian blinds and electrical cords. Shortly after the assailants left, Ms. Hunter was able to loosen her bonds and untie the other victims. They then called the police and reported the crime. Officer Thomas Musgrove of the Metropolitan Police Department responded to a radio run and arrived at the scene approximately ten to twenty minutes after the robbery. Officer Musgrove spoke with Mr. Peoples, Mr. Hunter, and Ms. Hunter and wrote down a description of the four men which was jointly given to him by Mr. Peoples and Mr. Hunter.[3]

On February 11, 1977 Detective Eddie J. Daily of the Metropolitan Police Department showed Mr. Hunter and Mr. Peoples an array of nine photographs. Detective Daily testified that each man selected the picture of codefendant Gilbert Davis (who was also convicted) as one of the robbers.

1. Defendant was sentenced to a term of three to nine years for the first degree burglary while armed count, to a term of five to twenty years' imprisonment for each of the armed robbery counts, and two to ten years for each of the assault with a dangerous weapon counts. All sentences were ordered to run concurrently with each other, but consecutively to any other sentence which appellant was serving.

2. Neither Mr. Walker nor Sharon Henderson testified at trial due to the government's inability to locate them.

3. Ms. Hunter was unable to identify any of the assailants because she was afraid to look at them during the robbery.

On March 14, 1977 both men separately identified appellant from a number of slides shown to them at police headquarters. Appellant was again identified by Mr. Hunter in a lineup on April 7, 1977. On January 20, 1978 Mr. Peoples made his second identification of appellant from a photograph of the April 7th lineup. Both men testified that they were certain of their two pre-trial and in-court identifications. Both men also testified that they had never seen any of the assailants prior to the events of December 8, 1976.

At the conclusion of the government's case-in-chief the parties stipulated that the scene was processed for fingerprints and that identifiable prints were taken from two bowls and a toaster. These latent prints were compared with those of appellant and codefendant Davis, but no matches were made. The government did not attempt to match the prints with those of the victims.

Appellant relied on an alibi defense and presented the following witnesses in support of his position, although he did not testify.

Joseph Kennedy testified that he had known appellant all of his life and that appellant drove a truck for him. Kennedy testified that appellant drove Mrs. Nettie Kennedy (the now-deceased wife of Mr. Kennedy), Agnes Walker, Hazel Jackson, and Clarence Cooper down to St. Petersburg, Florida in Mr. Kennedy's car. Using his December 1 probation reporting date to recall the dates of the Florida trip, Mr. Kennedy testified that the group departed Saturday, December 4, 1976 and returned Friday, December 10, 1976. However, Mr. Kennedy did not go on the trip to Florida, and did not see the group return on December 10. He had no personal knowledge of appellant actually being in Florida, and based his testimony on information received from his wife.

Agnes Walker, appellant's girlfriend, testified that she was employed by the Library of Congress and that she worked at a beauty parlor on a part-time basis. She accompanied appellant, Nettie Kennedy, Hazel Jackson, and Clarence Cooper on the Florida trip. Ms. Walker initially testified that they went to Tampa, but changed her testimony to St. Petersburg, after an outburst by Mr. Kennedy.[4] According to Ms. Walker, they left for Florida on a Saturday, the first week in December 1976. They arrived the next day, December 5th and stayed with Jack Kennedy, Joseph Kennedy's brother.

A dispute arose during the trip and Ms. Walker placed a collect call to her roommate, Margaret Thomas, on Wednesday or Thursday, asking her to send money with which to leave Florida. The telephone bill verifying this call was not available at the time of trial, and a C & P Telephone Company employee later testified that the company does not keep such records for more than six months. Apparently the roommate did not send the requested funds because Nettie Kennedy gave Ms. Walker air fare back to Washington, D.C. Ms. Walker was taken to the airport but because of a delay she returned to Jack Kennedy's home. The group, including appellant, then left Florida, arriving in Washington on December 10, 1976.

Eddie Blocker, Jr., appellant's ex-brother-in-law, testified that he received a collect call from appellant on December 6 or 7, 1976.[5] He did not know where the call was from, but he did recognize appellant's voice. The telephone bill verifying this call was also not available at trial.

Margaret Thomas was only able to testify that she did remember receiving a collect call from Ms. Walker. However, she was unable to give an exact date or year for the call.

In light of Ms. Walker's testimony the trial court suggested that her leave records from the Library of Congress be subpoenaed. In response to that the government called Deborah Moore in rebuttal. She was

---

4. Mr. Kennedy was immediately removed from the courtroom.

5. Ms. Walker testified that appellant placed this call after the airport episode.

employed as a payroll technician, assistant supervisor, at the Library of Congress. She had Ms. Walker's leave records for the period in question and they reflected that Ms. Walker worked during the relevant period of December 6 through December 10, 1976. Ms. Moore testified that these records were kept in the ordinary, necessary course of business; that they would reflect all annual leave, sick leave, and leave without pay; and, that Ms. Walker's records were properly certified by the appropriate supervisor.

During a recess after Ms. Moore's testimony, the trial judge told counsel that he would refer the case for possible perjury charges against Ms. Walker. Defense counsel advised the court that in December 1976, he had conferred with James Thomas, Ms. Walker's immediate supervisor, who at that time said he would provide testimony indicating that Ms. Walker was absent from work during the period she claimed to be in Florida. However, after the trial court gave defense counsel time to try to get Mr. Thomas to testify, defense counsel reported that Mr. Thomas had changed his position, that he could no longer recollect whether Ms. Walker did take leave on the crucial dates, and, if so, whether he credited that leave time at a later date, rather than when actually taken. Mr. Thomas, who had not been subpoenaed to testify, made it clear that he would be a most reluctant and uncooperative witness. In addition, defense counsel was unable, after speaking with Library of Congress personnel, to refute Ms. Moore's testimony. As a result, de-

fense counsel presented no rebuttal testimony with respect to the leave records. He did, however, request a mistrial because he could no longer effectively represent appellant. While the trial court stated there would be a full-blown investigation after the trial, he refused to declare a mistrial and stated he would "let the jury resolve the matter."

During discussions on jury instructions, the government requested the missing witness instruction as to Hazel Jackson, Clarence Cooper, and Perry Lart.[6] Defense counsel explained that they were unable to locate Mr. Cooper, appellant's brother. Hazel Jackson, appellant's aunt, was not called to testify because, according to the investigator working for defense counsel, she would not be helpful. While she remembered that a trip occurred, she was vague on the dates, and had a drinking problem. No explanation was offered as to Mr. Lart. The trial court gave the instruction for Ms. Jackson only.

## II.

Appellant contends that the trial court erroneously gave the "missing witness" instruction to the jury regarding the failure of appellant's aunt, Hazel Jackson, who was allegedly present during the automobile ride to Florida, to testify in his behalf at trial and further corroborate his alibi defense.[7] We agree for the following reasons.[8]

---

6. Mr. Lart was never identified in the record, nor was any explanation ever offered by the defense as to his absence after the government requested the missing witness instruction.

7. The trial court did refuse the government's request to give the missing witness instruction as to the failure of Clarence Cooper and Perry Lart to testify.

8. Appellant also argues the trial court committed reversible error by failing to fully investigate the discrepancies between Ms. Walker's leave records from the Library of Congress, her testimony, and the statements proffered by defense counsel as to what James Thomas, her supervisor during the time in question, would have testified, in the alternative, appellant argues that if such an investigation was not made

at that time, then a mistrial should have been declared.

We believe that the trial court handled the matter properly and gave defense counsel ample time to secure Mr. Thomas as a rebuttal witness even though he had not been subpoenaed. Upon learning that Mr. Thomas would not testify voluntarily, and that his memory of the events had grown conveniently hazy, and that defense counsel was unable to secure favorable information from any other employees at the Library of Congress, the court correctly decided to proceed with the trial and let the jury resolve the issue. It is well settled that "the declaration of a mistrial lies within the sound discretion of the trial court, and generally should be reserved for extreme situations threatening a miscarriage of justice," *Middle-*

In *Graves v. United States*, 150 U.S. 118, 121, 14 S.Ct. 40, 41, 37 L.Ed. 1021 (1893), the Supreme Court ruled that "if a party has it peculiarly within his power to produce witnesses whose testimony would elucidate the transaction, the fact that he does not do it creates the presumption that the testimony, if produced would be unfavorable." [9] As this Court pointed out in *Dent v. United States*, D.C.App., 404 A.2d 165, 170–71 (1979), the practical effect of this doctrine, which allows a jury to draw an adverse inference from the absence of evidence, is to create evidence from nonevidence. In *Burgess v. United States*, 142 U.S.App.D.C. 198, 206, 440 F.2d 226, 234 (1970), Judge Fahy expressed similar concerns about the ramifications of the doctrine:

> The missing witness instruction is not evidence, but is concerned with the absence of evidence. While the context in which the question arises may clothe the missing witness with significance, there is the danger that the instruction permitting an adverse inference may add a fictitious weight to one side or another of the case.

■ Mindful of the dangers inherent in the use of this instruction, the courts have required that counsel first obtain an advance ruling from the trial judge on the permissibility of arguing the missing witness inference to the jury. *Dent v. United States, supra*; *Givens v. United States*, D.C.App., 385 A.2d 24 (1978); *Gass v. United States*, 135 U.S.App.D.C. 11, 19–20, 416 F.2d 767, 775–76 (1969).[10] Before allowing

the inference to be argued to the jury, the court must first determine that two conditions are satisfied: (1) that the witness is peculiarly within the power of the party to produce,[11] and (2) that the witness' testimony would be likely to elucidate the transaction.

■ It is important to note, moreover, that "an unfavorable inference cannot be justified unless it can be said with reasonable assurance that it would have been natural for a party to have called the absent witness but for some apprehension [that his testimony would have been adverse]. And 'the party affected by the inference may of course explain it away by showing circumstances which otherwise account for his failure to produce the witness.'" *Burgess v. United States, supra*, 142 U.S.App.D.C. at 209, 440 F.2d at 237 (Robinson, J., concurring) (footnote omitted). Thus, even when the court makes the necessary factual determination that the two conditions have been met, it retains "considerable latitude" in determining whether the inference "is a natural and reasonable one" which would justify giving the instruction. *Id.* 142 U.S.App.D.C. at 205–206, 440 F.2d at 234–35. Judge Fahy went on to point out in *Burgess*, that "[n]ot every absent but producible witness who can be held to have some knowledge of the facts need by reason of *Graves* be made the subject of the 'presumption.'"

■ The absent alibi witness here, Hazel Jackson, was, peculiarly available to the defendant within the meaning of the

*ton v. United States*, D.C.App., 401 A.2d 109, 127 (1979). No such miscarriage of justice took place in this case, and a mistrial was not required.

9. That principle is now embodied in Instruction No. 2.41, *Criminal Jury Instructions for the District of Columbia* (1978).

10. The *Gass* court required that the following procedure be used:

> [T]hat for the future when counsel, either for the prosecution or the defense, intends to argue to the jury for an inference to be derived from the absence of a witness, an advance ruling from the trial court should be sought and obtained. [T]hat if such argument is to be permitted, an appropriate in-

struction should be given defining for the jury the conditions under which the inference might be properly drawn.

11. A witness is not "peculiarly available" to one party, where there is a showing that their identity was known and they could therefore be subpoenaed by the other side. *Brown v. United States*, 134 U.S.App.D.C. 269, 271, 414 F.2d 1165, 1167 (1969). In addition to "physical" availability, the witness must be "practically" available. Thus, even though a witness may be available for subpoena, s/he will be considered unavailable if their testimony is expected to be hostile. *Hale v. United States*, D.C.App., 361 A.2d 212, 216 (1976).

missing witness rule. *See Hale v. United States*, D.C.App., 361 A.2d 212, 216 (1976). We conclude however, that the second condition required for use of the instruction—that the witness' testimony would be likely to elucidate the transaction—was not satisfied and, therefore, that it was an abuse of discretion for the trial court to give the instruction. *See Johnson v. United States*, D.C.App., 398 A.2d 354, 365 (1979). In order to meet the elucidation requirement, it must be shown that the testimony would be important to the defendant's case, would be noncumulative, or would otherwise "be superior to other testimony already given on the matter." *Brown v. United States*, 134 U.S.App.D.C. 269, 270–71 n.2, 414 F.2d 1165, 1166–67 n.2 (1969).

█ In evaluating a request for a missing witness instruction, the trial court should consider—from the viewpoint of trial preparation—whether a particular witness would provide testimony which would be superior to that which counsel anticipates from other witnesses as well as testimony which would be noncumulative and nonduplicative.[12] Unless it can be established that the witness in question would provide new or additional evidence or would be manifestly more credible, we risk considerable unfairness by using the missing witness instruction to create adverse evidence from a party's decision not to call that witness. Moreover, in the absence of such affirmative benefits to the presentation of a case, it cannot be said with "reasonable assurance that it would have been natural for a party to have called the absent witness," *Burgess v. United States, supra*, 142 U.S.App.D.C. at 209, 440 F.2d at 237 (Robinson, J., concurring).

In the present case it was error to give the instruction since there was no affirmative showing by the government that Ms. Jackson's testimony could have elucidated the transaction. Given the testimony of Ms. Walker, who admittedly was in the car to Florida, testimony from another passenger such as Hazel Jackson, would not have been either superior or noncumulative. She had exactly the same vantage point, and, as appellant's aunt, would not have been manifestly more credible than Ms. Walker, appellant's girlfriend.

To give the missing witness instruction in such a situation, and allow the jury to draw the inference that Ms. Jackson's testimony would have been adverse to appellant, "would place an intolerable burden on a defendant," *Coombs v. United States*, D.C. App., 399 A.2d 1313, 1318 (1979), by "in effect creat[ing] evidence from nonevidence," and "add[ing] a fictitious weight to one side of the case." *Dent v. United States, supra* at 170–171.

The inevitable consequence of such a ruling would be to force lawyers to call as witnesses—in order to avoid the giving of a missing witness instruction—individuals who they suspect for one reason or another would be unfavorable, even though they could contribute nothing relevant or material to the issues in dispute. *Cf. Anderson v. United States*, D.C.App., 352 A.2d 392, 394 (1976) (trial court properly denied defense-requested instruction; testimony of missing government witness would be merely cumulative). Thus, conscientious and conservative counsel might feel compelled to put on the stand persons who were simply not credible because of their demeanor, or inarticulateness, or prior criminal convictions, or alcoholic or narcotics problems. Such a result would further neither the

---

12. Developments at trial cannot dictate the trial court's judgment on whether or not to give a missing witness instruction. Otherwise, we would open the door to such an instruction whenever a witness failed to survive cross examination unscathed. Counsel would then be penalized for having opted not to call an absent witness who either had nothing additional to add or who had inherent credibility problems (such as alcoholism, prior convictions, etc.).

*Cf. Shelton v. United States*, D.C.App., 388 A.2d 859, 864 (1978) (use of missing witness instruction was proper because testimony of missing witness "would have been more than cumulative; indeed it would have been superior," since absent witness had better vantage point than one defense witness and was "more credible" than the others—defendant and his girlfriend).

ends of justice nor the economy of judicial resources.[13]

Having concluded that it was error for the court to give the missing witness instruction, we must now determine whether it was harmless error under *Kotteakos v. United States*, 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946).[14] After a detailed review of the record, we do not believe that the error substantially swayed the verdict. The government presented two eyewitnesses to a robbery which occurred over at least a 45 minute period of time in a well-lit house. Both witnesses made slide, lineup and in-court identifications of appellant. Finally, the erroneous instruction pertained to defendant's alibi defense which we believe had been totally undermined by the discredited testimony of Agnes Walker, the only defense witness testifying of her personal knowledge about the trip to Florida. For these reasons, we conclude that, despite the missing witness instruction, the jury's "judgment was not substantially swayed by the error" and we are not "left in grave doubt" about "whether the error itself had substantial influence" on the final verdict, *Conyers v. United States*, D.C.App., 309 A.2d 309, 313–14 (1973) quoting *Kotteakos*.

*Affirmed.*

---

13. At oral argument, the government argued that, in order to obviate this problem, the parties should have present in court all witnesses whose absence might trigger a missing witness instruction, and that the trial court should hold an evidentiary hearing to determine whether the two preconditions for the instruction had been met. Thus, in this case, the government argued that in order to avoid the instruction, Ms. Jackson should have testified before the court, so that the trial judge himself could decide whether her testimony would have elucidated the transaction. We do not believe that this suggested mid-trial mini-hearing procedure is necessary, desirable, or efficient.

14. The *Kotteakos* formulation for determining harmless error is as follows:

But if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error, it is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand. [*Conyers v. United States*, D.C.App., 309 A.2d 309, 313–14 (1973), quoting *Kotteakos v. United States, supra* 328 U.S. at 765, 66 S.Ct. at 1248.]