**Marilyn MCPHERSON–CORDER,
Appellant,**

v.

**John CHINKHOTA, Appellee.**

**No. 00–CV–910.**

District of Columbia Court of Appeals.

Argued Nov. 14, 2001.
Decided Nov. 20, 2003.

Albert D. Brault, Washington, DC, with whom M. Kathleen Fallon was on the brief, for appellant.

John G. Gill, Jr. for appellee.

Before RUIZ and GLICKMAN, Associate Judges, and PRYOR, Senior Judge.

GLICKMAN, Associate Judge:

The trial court in this medical malpractice case instructed the jury that it could draw an adverse inference from a party's unexplained failure to call a witness if the witness was peculiarly available to that party and could have provided relevant testimony. This court has warned of the dangers of such "missing witness" instructions and discouraged trial courts from giving them too freely. We have cautioned that a missing witness instruction may be given only when certain stringent conditions are met. We recognize, however, that in some cases the instruction serves a legitimate purpose and is justified. This is such a case. On the unusual facts before us, we hold that the trial court did not err in giving a missing witness instruction, and we affirm the judgment on appeal.

## I.

On February 1, 1996, fourteen-year-old John Chinkhota slipped on an icy sidewalk. He fell with his legs spread-eagle and began to experience pain in his groin area. The pain subsided that night, enabling Chinkhota to sleep, but it returned the following day. That afternoon, Marieta Harper, Chinkhota's mother, took him to his pediatrician, Dr. Marilyn McPherson–Corder (Dr. Corder). Dr. Corder examined Chinkhota, found no sign of any serious problem, and concluded that Chinkhota had only sustained a minor "muscular strain."

Around 10:00 a.m. the following morning, a Saturday, Chinkhota awoke in pain, which he described as being in his genital area. The pain increased as the morning wore on and became more intense than Chinkhota previously had experienced. Ms. Harper telephoned Dr. Corder's office. The office was closed. An on-call physician (not Dr. Corder) returned the call around 11:45 a.m. and advised Ms. Harper to take Chinkhota to the Children's Hospital emergency room to be seen. Not appreciating that there was any urgency in the situation, Ms. Harper drove her other son to the mall before she took Chinkhota to the hospital emergency room. They arrived at the emergency room in the early afternoon, between 1:30 and 2:00 p.m. By this time Chinkhota's pain had worsened and he needed a cane to walk. Hospital doctors discovered that his right testicle had become abnormally twisted, or "torsed," an extremely painful condition in which the blood supply to the testicle via the spermatic cord is cut off and prompt treatment is required to prevent gangrene and loss of the testicle. In Chinkhota's case too much time had passed to save the testicle, and it had to be removed surgically that evening.

Ms. Harper commenced the present "next friend" action on Chinkhota's behalf in December 1997. (Chinkhota was substituted as the named plaintiff after he attained the age of majority.) The complaint charged that Chinkhota suffered the loss of his testicle as a result of Dr. Corder's professional negligence in two main respects. First, the complaint alleged that Dr. Corder was negligent in failing to discern the serious risk of testicular torsion and in not referring Chinkhota immediately to a urologist. Second, the complaint alleged that Dr. Corder was negligent in failing to warn Chinkhota and his mother of the potential risk of testicle loss or damage and the corresponding imperative need, in the event Chinkhota experienced increased pain in his groin area, to seek emergency treatment without delay.

Reflecting these two theories of negligence, the most important factual disputes at trial concerned what Dr. Corder did when she examined Chinkhota and what

Dr. Corder told him and his mother after her examination. Dr. Corder testified that she performed a thorough physical examination that lasted at least ten to fifteen minutes, in the course of which she considered and ruled out the possibility of testicular torsion. Dr. Corder said that she took a complete history from Chinkhota and specifically asked him about trauma in his groin area and any pain he was experiencing ("he denied having any pain"); that she observed Chinkhota walk normally and without evident distress; that she checked his testicles and did not find tenderness or swelling; and that she also checked his groin area generally and rotated his hip. Dr. Corder further testified that after she finished her examination, she instructed both Chinkhota and Ms. Harper to monitor any pain he felt and to call her office or go to the emergency room if the pain worsened.[1]

Chinkhota testified that Dr. Corder conducted a rushed, cursory and minimal examination that lasted perhaps five minutes. His mother, who was not present with him in the examining room and so did not observe what was done, agreed that Dr. Corder's examination was brief. Both Chinkhota and Ms. Harper testified that his pain noticeably prevented him from walking normally. Nonetheless, Chinkhota stated, Dr. Corder did not take a thorough history from him, did not ask him about trauma to his groin area, and did not ask him directly about the pain he was then experiencing. According to Chinkho-

ta, Dr. Corder inquired only whether it hurt when she pressed down on him (which it did not). Chinkhota stated that his testicles were swollen but that Dr. Corder did not ask about the swelling. Nor, Chinkhota said, did she check his groin area or rotate his hip as she described.[2]

Chinkhota and his mother also contradicted Dr. Corder's testimony about the post-examination instructions she furnished. Chinkhota testified that Dr. Corder told him only that "if the pain gets worse or if I feel pain to tell my mother," and said nothing about going to the emergency room or calling the doctor. Moreover, Chinkhota testified, he did not hear Dr. Corder give any instructions to his mother. Ms. Harper likewise denied that Dr. Corder said anything to her about monitoring the pain or about what to do if the pain recurred or worsened. On the contrary, Ms. Harper testified that Dr. Corder told her only that her son was "fine," that she had "checked him out and he's okay."

Dr. Corder testified that she examined Chinkhota in the presence of a student intern from Howard University who was rotating through her office as part of his training to be a physician's assistant. Dr. Corder failed to identify this student intern or call him to testify, however, and Chinkhota requested the trial court to give a "missing witness" instruction. Over Dr. Corder's objection, the court granted that request and instructed the jury that if a

---

1. Dr. Corder agreed that because Chinkhota was a minor, the applicable standard of care required her to give appropriate follow-up instructions to his mother in addition to Chinkhota himself.

2. While it was not claimed that Chinkhota was suffering from active torsion of his testicle when Dr. Corder examined him, Chinkhota's medical expert testified that a proper examination should have alerted Dr. Corder to the possibility of "intermittent torsion" (i.e., the episodic recurrence of abnormal twisting of the testicle and associated pain). According to this expert, Dr. Corder should have referred Chinkhota promptly to a urologist for immediate investigation of this possibility (and treatment that would have saved his testicle). Dr. Corder's medical experts disagreed. They testified that Dr. Corder's examination and treatment were appropriate under the circumstances.

party failed to call a witness who could have given relevant testimony and who was peculiarly available to that party, the jury could infer that the witness's testimony would have been unfavorable to the party, unless the absence of the witness was satisfactorily explained.

The jury returned a general plaintiff's verdict. Finding that Dr. Corder was "negligent in her care and treatment of John Chinkhota" and that her negligence proximately caused him harm, the jury awarded Chinkhota damages in the amount of $200,000. The trial court entered judgment in accordance with the verdict and denied Dr. Corder's post-trial motions. Dr. Corder then took this appeal.

## II.

Dr. Corder's principal contention, and the only one that merits extended discussion, is that the trial court abused its discretion in granting Chinkhota's request for a missing witness instruction. We begin our discussion by reviewing the settled principles of law that apply to this contention. We then turn to a careful scrutiny of the pertinent facts in light of those principles. Our inquiry satisfies us that the record in its totality supports the trial court's decision to give a missing witness instruction.

## A.

■ "It has been recognized for almost a century that 'if a party has it peculiarly within his power to produce witnesses whose testimony would elucidate the trans-

action, the fact that he does not do it creates the presumption that the testimony, if produced, would be unfavorable.'" *Harris v. United States*, 602 A.2d 154, 160 (D.C.1992) (en banc) (quoting *Graves v. United States*, 150 U.S. 118, 121, 14 S.Ct. 40, 37 L.Ed. 1021 (1893)). This is the premise, though we do not speak today in terms of a "presumption," for instructing the jury that it is permitted (but not required) to draw an adverse inference against a party deemed responsible for not calling a missing witness. The inference is not always justified, however, and there are well-recognized dangers in what has been termed the creation of evidence from non-evidence.[3] We have emphasized, therefore, that trial courts must exercise caution and restraint in deciding whether to give a missing witness instruction or permit counsel to argue the missing witness inference to the jury. *See Thomas*, 447 A.2d at 60. At a minimum, "[t]he two criteria that must be present before the jury may be invited to infer that the testimony of an absent witness would have been adverse to a party are (1) that the witness is *peculiarly within the power of the party to produce*, and (2) that the witness' testimony is *likely to elucidate* the transaction in issue." *Dent v. United States*, 404 A.2d 165, 169–170 (D.C.1979) (emphasis added). Once these two requirements are satisfied, the trial court has discretion to give or refuse a missing witness instruction and to allow or disallow argument by counsel. *Id.* at 171. "This discretionary decision should be guided by

---

**3.** This and other courts have noted the hazards related to the use of the missing witness inference. A primary function of jury instructions, as well as the rules of procedure and evidence, is to confine the jury's attention to firsthand testimony from those with personal knowledge of relevant facts, which may be probed on cross-examination, thereby excluding conjecture. The missing witness inference represents a radical departure from this

paradigm, for it essentially creates evidence from non-evidence. The risk is always present that the jury will give undue weight to the presumed content of testimony *not* presented, and insufficient weight to that which *was* presented.

*Thomas v. United States*, 447 A.2d 52, 58 (D.C.1982) (citations omitted; emphasis in the original).

reference to the underlying rationale for the doctrine, by considering whether from all circumstances an inference of unfavorable testimony from an absent witness is a natural and reasonable one." *Thomas,* 447 A.2d at 58 (internal quotation marks and citations omitted).[4]

 To satisfy the "peculiar availability" requirement, the record must show that the party against whom the adverse inference is sought "had the physical ability to locate and produce the witness and there was such a relationship, in legal status or on the facts as claimed by the party as to make it natural to expect the party to have called the witness." *Thomas,* 447 A.2d at 57 (internal quotation marks and citation omitted). "Thus if a party has made bona fide reasonable efforts to produce the witness without success, no adverse inference will be permitted." *Id.* "Practical availability is also required." *Id.* at 58. "The party's ability to produce the witness, or his reasons for doing so, must be stronger than those of the party seeking an inference in his favor. Otherwise, an inference might just as well be drawn *against* the party who favors a missing witness inference." *Id.* (emphasis in the original). Ordinarily, therefore, a witness who is amenable to subpoena and is not uncooperative will not be deemed peculiarly available to a party if the opposing party knows or with reasonable diligence should know the witness's identity— for then the witness is available more or less equally to both sides. *Cf. Katkish v. District of Columbia,* 763 A.2d 703, 707 n. 2 (D.C.2000); *Cooper v. United States,* 415 A.2d 528, 533 n. 11 (D.C.1980). This point has special force in civil litigation such as the present case, where the parties have effective tools of discovery at their disposal. Except where the identity of the witness is concealed or other serious obstacles are interposed, it is rare that a civil litigant can establish the requisite disparity in witness availability for the missing witness instruction to be given.

 To satisfy the "elucidation" requirement, the testimony of the absent witness "must be both material and relevant to a disputed issue, must be noncumulative, and must constitute an important part of the case of the party against whom the inference is drawn." *Stager,* 494 A.2d at 1313 (citations omitted). "In evaluating a request for a missing witness instruction, the trial court should consider—from the viewpoint of trial preparation—whether a particular witness would provide testimony which would be superior to that which counsel anticipates from other witnesses as well as testimony which would be noncumulative and nonduplicative." *Cooper,* 415 A.2d at 534. "Unless it can be established that the witness in question would provide new or additional evidence or would be manifestly more credible [than other witnesses who testified], we risk considerable unfairness by using the missing witness instruction to create adverse evidence from a party's decision not to call that witness." *Id.*

With the foregoing principles to guide us, we proceed to examine the record that was made in this case to see if it supports the trial court's decision to give a missing witness instruction.

---

4. Seeking to discourage excessive invocation of the inference, we have said that "it seldom will constitute error to deny the missing witness instruction or to prohibit argument of the missing witness inference." *Stager v. Schneider,* 494 A.2d 1307, 1313 (D.C.1985).

"[I]t is less likely that we will find an abuse of discretion where the trial court refuses to give a missing witness instruction and permit a missing witness argument, than where its ruling is to the contra." *Lawson v. United States,* 514 A.2d 787, 790 (D.C.1986).

## B.

■ Soon after she filed her complaint, Ms. Harper propounded an interrogatory to Dr. Corder asking for "the name and address of any person whom you believe has personal knowledge of any facts material to this case." Among the persons Dr. Corder listed in her answer to this interrogatory was "a physician's assistant student who was rotating through my office whose name we are attempting to find." At her subsequent deposition, Dr. Corder testified that she still did not know the name of the student, who was from Howard University, but that she could "possibly be able to identify him" by "pulling up the rotation schedule."

In the two years that passed between her deposition and the start of trial, Dr. Corder did not supply the name of the student intern. Chinkhota listed the "as yet unnamed Physician's Assistant" on the witness list he filed in June of 1999. Chinkhota made no further effort to identify or locate the student, however. The Joint Pre–Trial Statement that the parties filed in February 2000 stated, without explanation, that the plaintiff would be requesting a *missing witness instruction*. Dr. Corder did not indicate that she would oppose such an instruction. The trial court adopted the Joint Pre–Trial Statement in its pretrial order without mentioning the issue, stating only that it would advise the parties in advance of final arguments of its determinations as to jury instructions.

Trial got under way on May 22, 2000. Chinkhota called Dr. Corder as his first witness. When she was asked how long her examination of Chinkhota lasted, Dr. Corder answered, "At least ten or fifteen minutes," and then she added, "because I also had my student with me, and in that manner, we have to go through the total system." Chinkhota's counsel then sought without success to ascertain the identity of Dr. Corder's student:

Q. Who was your student?

A. Who was my student?

Q. Yes.

A. It was a physician assistant student.

Q. What was his name, it was a he, right?

A. It was a he.

Q. What was his name?

A. I don't have his name right in front of me.

At this point counsel confronted Dr. Corder with her deposition testimony that she might be able to identify the student by checking the rotation schedule. The ensuing examination elicited Dr. Corder's seemingly unwilling admission that she had narrowed the identity of the student down to one of two names but did not "want to say" which one it might be:

Q. Did you try to find out his identity?

A. Yes, there were six other students.

Q. Did you try to find out?

A. Four of them were male, I knew it was a male but I don't have the actual identity at the time.

Q. This person who was with you when you examined John Chinkhota for groin pain on February 2, 1996, you don't know who he is?

A. I know he was one of my students at the time.

Q. His name, do you know his name?

A. I don't have his name right in front of me, no, I do not.

Q. Did you say you tried or did not try to find out who he was?

A. I said that I know that there were six students at the time during the rotation. So the exact identity of that student, I can't tell you his exact-

THE COURT: Mr. Gill's question is, did you make an effort—

THE WITNESS: Yes.

THE COURT:—to find out. You did try?

THE WITNESS: Yes, I did

THE COURT: Were you able to find out who he is?

THE WITNESS: I gave a call to the office and that information I believe is— I don't have it in front of me. *I believe it was one of two names. I don't want to say which of the two names-*

BY MR. GILL:

Q. Did you talk to those people?

A. No, I did not.

Q. That person was with you the entire time of the examination of John?

A. That's correct.

(Emphasis added.)

Dr. Corder's mention of her student intern foreshadowed an emerging theme of her defense, namely that she used her examination of Chinkhota for teaching purposes—implicitly enhancing her credibility and increasing the likelihood that she performed the examination carefully and completely. The theme unfolded when Dr. Corder returned to the witness stand in the defense case. In her testimony on direct, Dr. Corder explained that she had been on the faculty of the physician assistants program for sixteen years and that her office was one of the teaching sites through which students from Howard University and other schools rotated as part of their clinical training. Dr. Corder then detailed how she instructed one of those students during her examination of Chinkhota on February 2, 1996. At the start of the examination, Dr. Corder said, "I was talking to the student in terms of things that we have to consider. And we went through discussion on evaluating an adolescent male with any type of discomfort or history of any type of pain." Next, Dr. Corder testified, as Chinkhota lay on the examining table, "*we* checked him, *we* inspected him, and then *we* began.... *We* checked testicles, *we* checked groin, *we* checked knee ... *we* saw no signs ...." (Emphasis added.) Dr. Corder twice interrupted her description to repeat that she "was talking to the student" throughout the examination.

Dr. Corder testified that the student also was present when she advised Chinkhota and his mother after the examination. Still training her student, Dr. Corder told Chinkhota that if he experienced any pain he should tell his mother or go to the emergency room, "[a]nd I emphasized to the student and then I asked John whether or not there were any questions, did he understand." Then, Dr. Corder added, while Chinkhota was getting dressed, "we [i.e., Dr. Corder and her student] walked out of the room and approached his mother who was still in the triage area.... [A]nd I told her I had not found anything but if anything came up, to give us a call. Any pain, give us a call or go to the emergency room."

Finally, Dr. Corder testified that she "discussed the case" further with the student after Chinkhota and his mother left the office. Dr Corder remembered "asking the student some questions" as she wrote up her notes "on things that we were considering and what you call your learning differential." [5] As Dr. Corder put it, "[w]e walked and talked together."

On cross-examination, Dr. Corder acknowledged that one reason she remembered her examination of Chinkhota "so clearly" was because she was teaching her physician's assistant student as she performed it. Dr. Corder also agreed that

---

**5.** Dr. Corder's notes were in evidence at trial. Dr. Corder relied on the notes to support her description of the examination she performed and the advice she gave to Chinkhota. Chinkhota emphasized that the notes said nothing about advice given to his mother.

the student would have been "a good witness to come in here and tell us exactly what happened." Nonetheless, Dr. Corder declined to respond helpfully when Chinkhota's counsel attempted yet again to ascertain the student's identity:

Q. And what's his name?

A. The student's name?

Q. Yes.

A. It's one of two. There's two of the students and I rather not give his name in terms of which of the two they were.

＊　　＊　　＊　　＊　　＊　　＊

Q. [Y]ou're unwilling to give us that person's name, is that correct?

A. I'm unwilling? I'm unable to give his name right now.

THE COURT: Is that because you don't know it or that you just prefer not to give the name? [6]

THE WITNESS: Well, I know—I know who it was in terms of—*I picture his face, et cetera, but I prefer not to give his name.*

(Emphasis added.)

In his rebuttal case, Chinkhota's counsel read into the record Dr. Corder's interrogatory answer and deposition testimony regarding her efforts and ability to identify the student.[7]

After the case was submitted and the jury was excused for the day, the court heard argument over the propriety of a missing witness instruction. Dr. Corder's counsel opposed the instruction on the grounds that neither the "peculiar availability" nor the "elucidation" requirements for giving the instruction had been established in the case of the student intern. The trial court was not persuaded by the defense position. The court rejected the defense argument that the student was equally available to both sides, observing, in particular, that Dr. Corder "knows who he [the student] is, but has taken it upon herself" not to disclose his identity, with *no explanation other than* that "she prefers not to give his name." In addition, the court found that "the jury might well conclude that he [the student] would have been able to state the circumstances surrounding the examination and the appearance of the plaintiff." Moreover, the court stated, the student "might have been able to say whether the defendant had in-

---

**6.** Although she interposed no objection at trial, Dr. Corder complains on appeal that the trial court abused its discretion and demonstrated bias by questioning her at this juncture. The question that the court asked was neutral, non-leading, and plainly intended to secure clarification of an important point. There was no abuse of discretion. *See Womack v. United States*, 350 A.2d 381, 383 (D.C. 1976) (terming it "beyond question" that a court has discretion to "interrogate a witness in the aid of truth and furtherance of justice").

**7.** Chinkhota's counsel initially stated that he would not present any rebuttal case. The trial court then asked counsel if he did not need to lay a further foundation for the missing witness instruction he was seeking. Only after being thus prompted did counsel read the jury the interrogatory answer and the deposition excerpt. Dr. Corder's counsel asked to "note" a non-specific objection to "the proceeding that we just had." On appeal Dr. Corder argues that the trial court showed favoritism to Chinkhota and abused its discretion by alerting him to the need to complete the foundation. Assuming *arguendo* that Dr. Corder preserved this objection, we see no merit to it. "The trial judge need not remain silent while observing a patent omission which might vitiate a full adjudication...." *Perry v. United States*, 364 A.2d 617, 620 n. 4 (D.C.1976) (finding no abuse of discretion where trial judge prompted prosecution to produce evidence relating to chain of custody of marijuana seized from the defendant). The judge is vested with discretion to intervene in order to raise "matters which may significantly promote a just determination of the trial." *Id.* (quoting ABA STANDARDS, THE FUNCTION OF THE TRIAL JUDGE, § 1.1 (1972)).

formed the mother" appropriately following the examination of Chinkhota. Nevertheless, the court advised Dr. Corder's counsel that if he was able to produce the student by the next morning, he would be given a further "opportunity to make a record."

The next morning, Dr. Corder's counsel made the following representations to the court regarding the missing witness:

> I want the Court to know that when the investigation was made by Ms. Parker [co-counsel] in 1998, she was advised that *they could not identify the individual involved, and Howard was unable to tell us, Howard University.*
>
> I have since learned the reason was that the gentleman involved was originally assigned to another practice, and he switched to the Corder practice. And accordingly, *the records did not reveal that.* And on the initial inquiry, *we thought nothing more about it.* No other issue was raised. No question raised. No follow up from other side.
>
> *When the matter came up yesterday, I had a detailed, as much investigation as possible, and learned that the man's name is Campbell.* We traced him to a hospital in Georgia. From there, we've traced him to the Greater Southeast Community Hospital [in Washington, D.C.]. And he works there as a Physician Assistant in the Emergency Room. I was able to speak with him at 6:15 last night, he has no-
>
> THE COURT: Where is he, in Southeast—
>
> MR. BRAULT: Greater Southeast Community Hospital. He cannot come to Court. He has been diagnosed with cancer, going for treatment this morning. Although he's still able to work, he comes in at 10:00, after his treatment. I asked him as much as I could about this. *He has no memory of the specific case.* He could talk about his experience with

the doctor, but I don't see how that's relevant.

(Emphasis added.) After hearing these representations, the trial court concluded that it would give the missing witness instruction.

### C.

The record recited above establishes that the prerequisites for giving a missing witness instruction were met in this case and that the trial court did not abuse its discretion in deciding to give that instruction.

To begin with, the student intern was "peculiarly available" to Dr. Corder. Dr. Corder and her attorneys plainly had the physical and the practical ability to identify, locate and produce the student—as they demonstrated they could do on twenty-four hours' notice on the last day of trial. The record refutes any notion that Dr. Corder's reported inability to find the student prior to trial was genuine, for by her own admission she knew the student was one of just two persons whose names she recalled or had determined. She and her attorneys simply chose not to pursue the matter. Furthermore, the record shows that Dr. Corder had strong reasons to produce the student (unless she believed his testimony would have been adverse to her) as well as the ability to do so. By Dr. Corder's account, the student was a close and intimately involved observer of her interaction with Chinkhota and his mother—an interaction that Dr. Corder used as a vehicle to teach the student the proper way to examine and advise an adolescent with a possible groin injury. On the facts as Dr. Corder portrayed them, it would have been "natural to expect [Dr. Corder] to have called the [student]." *Thomas,* 447 A.2d at 57.

The record also affirmatively shows that the student was not available to Chinkhota.

Dr. Corder did not cooperate with Chinkhota's inquiries, and without her help Chinkhota could not have identified the student. Dr. Corder's counsel admitted as much when he told the trial court that Howard University's records did not reveal who the student was and that Howard "could not identify the individual involved." Because of Dr. Corder's lack of cooperation, which (taking into account her evasive trial testimony) arguably bordered on concealment, this truly is the unusual case in which the missing witness was peculiarly available to one side.

The "elucidation" requirement was satisfied too. The absent student was the only potentially disinterested witness with firsthand knowledge about the two central factual disputes at trial—whether Dr. Corder performed a thorough examination of Chinkhota and whether she properly advised Chinkhota and his mother following her examination. "[F]rom the viewpoint of trial preparation," the student could have provided testimony "superior to that which counsel anticipate[d] from other witnesses as well as testimony which would be noncumulative and nonduplicative." *Cooper*, 415 A.2d at 534.

We are not persuaded otherwise merely because Dr. Corder's counsel reported to the trial court that the student no longer remembered the events at issue. Counsel did not report in any detail what efforts he had made to probe or revive the student's memory, and, of course, Chinkhota and the trial court were not afforded the opportunity to test the student's recall for themselves. Even accepting counsel's self-serving report at face value, moreover, a trier of fact could have reason to doubt that Dr. Corder conducted a thorough physical examination during which she taught her student valuable clinical lessons about evaluating a potentially serious and unusual condition just from the very fact that the student himself had no memory whatsoever of the episode. Most important, though, if the student really could no longer recall any of the key events, that likely was because Dr. Corder delayed contacting the student until more than four years after those events occurred. The student well might have remembered if Dr. Corder had interviewed him with reasonablepromptitude. Where it reasonably appears that a missing witness was peculiarly available to a party and could have elucidated disputed issues at trial if the party had made contact with the witness in a timely manner, the party's unjustified dilatoriness should not be permitted to defeat the opposing party's entitlement to a missing witness instruction.

Finally, having concluded that the prerequisites were satisfied, we perceive no abuse of discretion on the part of the trial court in electing to deliver a missing witness instruction. Given the prominent and uniquely disinterested role that Dr. Corder ascribed to the student, it is reasonable to think that she would have secured his testimony had she believed it would have supported her defense. Since Dr. Corder offered no good explanation for not securing the student's testimony, it is plausible that she did not believe it would be helpful. Dr. Corder's apparent stonewalling in discovery and her evasive testimony at trial, which culminated in her unexplained refusal on the witness stand to name the student, strengthened the implication that she believed the student would have been an adverse witness. "[F]rom all the circumstances an inference of unfavorable testimony from [the absent student] witness [was] a natural and reasonable one." *Thomas*, 447 A.2d at 58.

## III.

■ We shall dispose summarily of Dr. Corder's other contentions on appeal. Dr. Corder contends, first, that the trial

court abused its discretion by giving the jury a separate instruction regarding the physician's duty to warn a patient of dangers to which the patient potentially is exposed. *See Canterbury v. Spence,* 150 U.S.App. D.C. 263, 272, 464 F.2d 772, 781 (1972). Dr. Corder argues that the instruction accorded undue emphasis to a theory of negligence that was not supported by the evidence inasmuch as Chinkhota was not suffering from testicular torsion at the time Dr. Corder saw him.[8] We are not persuaded. The trial court did not abuse its broad discretion in determining what instructions are appropriate, especially in light of the complexity of the issue presented and the basic principle that a party is entitled to an instruction on its theory of the case if that theory is supported by the facts in evidence. *See Nelson v. McCreary,* 694 A.2d 897, 901 (D.C.1997). The evidentiary support was there, given, *inter alia,* the expert testimony that Dr. Corder should have perceived the danger of intermittent torsion. *See* footnote 2, *supra.*

■■■■ Dr. Corder's remaining contention is that the trial judge displayed partiality by assisting the plaintiff's case, by questioning witnesses himself and by issuing evidentiary rulings adverse to the defense. We have addressed this contention in footnotes 6, 7, and 8, *supra,* and the additional judicial acts that Dr. Corder cites are, if questionable at all, too picayune to call for individualized attention. It suffices to reiterate that "[a] trial judge bears the responsibility for the orderly and fair administration of a trial, and has not only the right, but the duty ... to partici-

pate directly in the trial, including the propounding of questions when it becomes essential to the development of the facts of the case." *Talley v. Varma,* 689 A.2d 547, 550 n. 1 (D.C.1997) (internal quotation marks and citations omitted). The trial judge in this case acted in that spirit with suitable restraint and balance. We observe, too, that the judge issued significant rulings that disfavored the plaintiff as well as rulings that went against the defense. "The test for whether a trial was fatally tainted with alleged prejudice by the judge is whether the impartiality of the judge might reasonably be questioned." *Id.* Dr. Corder's bill of particulars does not "come at all close to entitling [her] to relief under that standard." *Id.*

## IV.

The trial court did not err in giving a missing witness instruction or in any other respect that would call for reversal. We affirm the judgment on appeal.

*So ordered.*

___

8. Chinkhota himself did not request a special instruction on the physician's duty to warn. The trial court *sua sponte* suggested that such an instruction would be desirable to guide the jury on the applicable legal principles and directed the parties to brief the issue. Dr. Corder argues that by raising the question of a special instruction on its own initiative, the trial court displayed bias in favor of Chinkhota. We reject that charge as groundless. If anything, the opposite is the case—the court undertook to ensure that the jury would render a reasoned and legally correct determination of the issue. We note that the instruction itself was even-handed.